**SIMPLEX TIME RECORDER COMPANY, Petitioner,**

v.

**SECRETARY OF LABOR, Respondent.**

**William E. BROCK, Secretary of Labor, Petitioner,**

v.

**SIMPLEX TIME RECORDER COMPANY, Respondent.**

Nos. 83–2164, 83–2297.

United States Court of Appeals, District of Columbia Circuit.

Argued March 20, 1985.

Decided July 5, 1985.

Robert D. Moran, Washington, D.C., for petitioner in No. 83–2164 and respondent in No. 83–2297.

Domenique Kirchner, Atty., Dept. of Labor, Washington, D.C., with whom Judith N. Macaluso, Asst. Counsel for Appellate Litigation, Dept. of Labor, Washington D.C., was on brief, for respondent in No. 83–2164 and petitioner in No. 83–2297.

Before WALD, BORK and DAVIS *, Circuit Judges.

Opinion for the Court filed by Circuit Judge DAVIS.

Opinion dissenting only as to Part VII(A) filed by Circuit Judge WALD.

DAVIS, Circuit Judge:

This is a case under OSHA (the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678 (1982)) in which both sides appeal. Simplex Time Recorder Co. (Simplex or the company) petitions for review of an order issued by the Occupational Safety and Health Review Commission (OSHRC or Commission), charging Simplex with several nonserious violations of OSHA, and assessing a $3600 penalty as well as directing abatement. The Secretary of Labor (Secretary) cross-petitions, alleging error in the Commission's determination that the charges are nonserious; the Secretary also seeks review of the Commission's decision that Simplex did not violate an Occupational Safety and Health Administration (the Administration) regulation which requires employers to report incidents resulting in the hospitalization of five or more employ-

ees. We affirm the Commission's decision insofar as properly appealed.

## I. BACKGROUND

Simplex is a manufacturer of time clocks, fire detection equipment and other mechanical devices. The dispute concerns mainly the operations performed in Building 11 of Simplex's manufacturing facility in Springfield, Massachusetts. Building 11 contains three spray booths in which Simplex paints its products. Two of these booths are electrostatic, *i.e.*, they contain automatic, mechanized painting equipment which requires no continuous employee supervision. The third booth is manual. Hanging from an overhead conveyor, the pieces to be painted pass through the electrostatic booths and into the manual booth where a company employee inspects the paint job and touches up spots the electrostatic sprayers missed. The three booths are separated by walls except for an opening through which the conveyor takes the parts from one station to the next.

On August 6, 1981, a fire erupted in Building 11 which resulted in the death of a Simplex employee. The deceased's brother filed a written complaint with the Administration asserting that hazardous conditions existed in the electrostatic spray booths. The Secretary decided to investigate these allegations.

On August 24, 1981, an Administration compliance officer (Mr. Barnes) arrived at Simplex to conduct that investigation. Before he was admitted onto company property, Simplex's safety engineer (Mr. Tremblay) took a copy of the complaint to the company's counsel. When Mr. Tremblay returned, he informed Mr. Barnes that Simplex would allow an inspection. The actual inspection took five days—through the end of August and beginning of September 1981. During the inspection, Mr. Tremblay escorted Mr. Barnes throughout Building 11, and was apparently quite solicitous overall. Neither Mr. Tremblay nor any

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

other representative of Simplex objected to any aspect of Mr. Barnes' inspection at that time.

Later in 1981, the Secretary issued a citation charging Simplex with, *inter alia*,[1] four serious violations of Administration regulations concerning the use of flammable or combustible liquids (29 C.F.R. § 1910.106 (1984)) and Administration regulations regarding spray finishing with flammable and combustible materials (*id.*, § 1910.107). The Secretary also charged Simplex with one willful violation of the provisions on cleaning spray booths under § 1910.107. The particulars of these charges are set forth in our discussion, *infra*.

The Commission assigned this case (OSHRC Docket No. 82–12) to an Administrative Law Judge (ALJ), who consolidated the case with another (OSHRC Docket No. 82–301) also involving Simplex. In 82–301 the Secretary charged Simplex with violating Administration regulation 29 C.F.R. § 1904.8 (1984), requiring that employers notify the Administration of employment-related accidents resulting in the hospitalization of five or more employees. This charge stemmed from a separate incident in which seventeen Simplex employees in the company's printed circuit department inhaled natural gas which leaked into their work area through cracks in the wall of the building. One employee remained in the hospital for nine days; the others were released on the same day they were examined.

The ALJ conducted a ten-day hearing in October 1982 and January 1983. At the hearing, Simplex presented several objections to the Secretary's citations generally, and denied each charge specifically. Simplex's general objections were: first, the search by Mr. Barnes exceeded the scope of Simplex's consent because it covered areas not specifically mentioned in the complaint to the agency; second, the regulations said to support the charges in Docket No. 82–12 are invalid because they purport to be national consensus standards promulgated pursuant to abbreviated procedures under 29 U.S.C. § 655(a), but were actually modified standards which can only be promulgated under the more elaborate procedures of 29 U.S.C. § 655(b); and, third, the Secretary's citation was improperly amended (after the six-month statute of limitations had run) to incorporate a period of time not included in the original citation. As to the single charge in Docket No. 83–301, Simplex argued that only one employee was actually "hospitalized," and no report was required.

The ALJ rejected Simplex's three general objections in Docket No. 82–12. With regard to the search, he ruled that Simplex impliedly consented to every aspect of the inspection by escorting Mr. Barnes throughout, and never voicing an objection. The ALJ also ruled that the regulations were valid for the purposes of this case because the only pertinent modification by the Secretary of a national consensus standard merely deleted a redundancy in the standard and did not affect Simplex's rights. The ALJ allowed the amendment to the complaint because it did not inject substantially different issues into the case, and the new time period better reflected Simplex's production processes and procedures.

Simplex contends that the ALJ erred in refusing to allow it to call certain witnesses. Some of these witnesses had already testified, and the ALJ determined that their testimony would be merely cumulative. Other proposed witnesses were top Department of Labor officials, who the ALJ found to have no personal knowledge of the facts surrounding this particular case. He refused to allow the company to call those witnesses.

On the four charges of serious violations, the ALJ ruled that the Secretary had proved a violation of the regulations, but had failed to demonstrate that the violations were "serious" within the OSHA definition, 29 U.S.C. § 666(k). Because he found these violations to be nonserious, he

---

1. We list only those charges which are at issue on this appeal. The Commission ruled in Simplex's favor on several matters; the Secretary has not petitioned for review of all these issues.

imposed no monetary sanctions. The ALJ also sustained the charged willful violation (entailing a monetary penalty). However, the ALJ found that Simplex did not violate the reporting regulation since only one employee was actually "hospitalized."

Each side sought review by the Commission. On October 28, 1983, the Commission directed review only as to the finding of a willful violation. Three days later, the Commission issued an order severing Docket No. 82–301 and those items in Docket No. 82–12 not mentioned in the Direction for Review. As to these severed matters, the decision of the ALJ became the final order of the Commission. The current petition and cross-petition are from this final order.

## II. THE SEARCH

The company argues that the search in this case was more extensive than allowed by its consent. It points out that the complaint which led to the search alleged violations only in the electrostatic booths, while the Administration inspector searched the manual booth also. Several of the resulting citation items concern the manual booth. Simplex concludes that the evidence supporting these charges should have been suppressed as the fruit of an unconstitutional search, citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), in which the Supreme Court held that Administration inspectors must obtain a search warrant prior to instituting a nonconsensual search. We conclude, however, that neither Simplex's premise nor its conclusion is correct.

■ To determine whether a party has consented to a search, a court must look to the circumstances surrounding the event. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973); *Donovan v. A.A. Beiro Construction Co.*, 241 U.S.App.D.C. 161, 746 F.2d 894, 901 (1984). No one factor is necessarily decisive, but the Supreme Court has held that knowledge by the party challenging the search of its right not to consent is "highly relevant" to the evaluation. *Unit-*

*ed States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980). Here, Mr. Tremblay consulted with Simplex's counsel after initially forbidding Mr. Barnes to enter. This indicates that Simplex knew it could object at any time to Mr. Barnes' continued inquiries and require him to obtain a warrant. For that reason its representatives' later silence, during the actual inspection, works against Simplex.

■ The Seventh Circuit considered like circumstances in *Kropp Forge Co. v. Secretary of Labor*, 657 F.2d 119 (7th Cir. 1981). The written complaint which led to the inspection in *Kropp* alleged a carbon monoxide hazard. During the initial inspection, the Administration compliance officer felt that the noise in the workplace might exceed pertinent standards. She later returned to test the noise level. The court ruled that the inspection was proper:

> The record shows, however, that at all times on December 13, the compliance officer was accompanied by Kropp's Safety Director and that on December 19, she and a second compliance officer were accompanied by the Safety Director and Kropp's General Manager. Both men had been informed that noise sampling would be conducted, and they raised no objections to the approximately five hours of sampling conducted on each day.... Since Kropp's representatives were present at all times during these inspections and did not raise any objections when informed of the intended sampling, any Fourth Amendment objection to these surveys was waived. [Citation omitted.]

*Id.* at 121–22. *See also Stephenson Enterprises, Inc. v. Marshall*, 578 F.2d 1021, 1023–24 (5th Cir.1978) (company consented to walk-through inspection when its representative accompanied the inspector and failed to raise any objections); *cf. Donovan v. Carolina Stalite Co.*, 236 U.S.App.D.C. 264, 734 F.2d 1547 (1984) (the company effectively consented to an inspection under the Mine Safety and Health Act when upper-level managers, having heard the in-

spector's interpretation of the statute, had ample opportunity to familiarize themselves with its procedures). In the current instance, the ALJ's determination that company consent was freely and voluntarily given is similarly supported by appropriate evidence.

■ Moreover, Simplex's version of the Fourth Amendment's impact on consensual searches is derived from criminal, not purely administrative, procedure. The two are different. *See Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (fire department may enter home to further administrative goals (*e.g.,* to detect the cause of a fire), but not to investigate crime) (plurality opinion); *A.A. Beiro, supra,* 746 F.2d at 903 (Beiro "erroneously equat[ed] consensual and warrant searches"). Even in a situation in which an administrative warrant is required, the warrant need not track precisely the scope of the complaint. *Donovan v. Burlington Northern, Inc.,* 694 F.2d 1213 (9th Cir. 1982) (general warrant may issue on specific complaint), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3538, 77 L.Ed.2d 1388 (1983); *Marshall v. North American Car Co.,* 626 F.2d 320, 323 (3d Cir.1980) (though "the scope of the inspection must bear some relationship to the alleged violations in the employee complaint," it need not track them precisely). Accordingly, given the close proximity and interrelated functions of the manual and electrostatic booths, we are not ready to hold—as Simplex would have us do—that the inspector in this case was barred by the Fourth Amendment from entering the manual booth absent specific and express consent by Simplex which had indisputably allowed the inspection of at least that portion of Building 11.

2. Several courts of appeals have considered whether and to what extent the pre-enforcement review provision of section 6(f) of OSHA precludes challenges to the validity of standards promulgated under section 6 in enforcement proceedings before the Commission. None of those courts has denied that substantive challenges to the standard may be raised in subsequent enforcement proceedings. The Eighth Circuit, however, has drawn a distinction between substantive challenges and procedural challenges, and has concluded that the latter

## III. THE VALIDITY OF THE REGULATIONS

OSHA grants to the Secretary the authority to promulgate regulations concerning safety in the workplace. During the first two years following passage of the Act, the Secretary had two options as to the procedures he could follow for these regulations. Under 29 U.S.C. § 655(a), the Secretary could adopt any national consensus standard without pursuing formal rulemaking procedures. A national consensus standard is a rule adopted by a nationally recognized standards-producing organization in such a fashion that the Secretary can determine that, after the expression of diverse views, those interested in and affected by the rule reached substantial agreement as to its contents. *Id.* at § 652(9). Unless the Secretary adopted a national consensus standard, more elaborate procedures (such as those contained in 29 U.S.C. § 655(b)) were required. For example, 29 U.S.C. § 655(b)(8) states that if the Secretary adopts a rule which "differs substantially from an existing national consensus standard," the Secretary must concurrently publish a notice in the Federal Register explaining the modification.

■ Simplex argues that the regulations at issue here, promulgated within two years of OSHA's passage and derived from national consensus standards, differ from those standards in several ways. It is said that therefore the Secretary was required at least to provide some explanation in the Federal Register for the differences between the national consensus standard and the regulation as adopted, if not more.[2]

could not be raised in an enforcement proceeding. *National Industrial Constructors, Inc. v. OSHRC,* 583 F.2d 1048, 1051–53 (8th Cir.1978). The Fifth and Ninth Circuits have concluded that the legislative history suggests that Congress intended to allow challenges to the validity of standards in enforcement proceedings without regard to this distinction between substance and procedure. *Deering Milliken, Inc. v. OSHRC,* 630 F.2d 1094, 1099 (5th Cir.1980); *Marshall v. Union Oil Co.,* 616 F.2d 1113, 1117–18 (9th Cir.1980). These courts have therefore

The first thing to note is that many of the modifications of which Simplex complains have no apparent bearing whatsoever on the current case. Simplex contends, however, that the standards before us are the product of compromise, and that any alteration by the Secretary necessarily unraveled the precise regulatory weave which the standards organization had spun. The result, according to Simplex, is that any alteration renders the entire provision invalid.

■ We cannot accept the company's reasoning. For one thing, that position would call for the wholesale invalidation of numerous Administration standards which depart somewhat (perhaps very slightly) from the original versions. We cannot tell what compromises were exchanged as to which standards over what period of time. Under Simplex's basic contention, the entire portion of the Code of Federal Regulations which contains standards originally adopted (as here) by the National Fire Protection Association (NFPA) would be invalid. That wholesale approach cannot have been the congressional intention. *See, e.g.,* 29 U.S.C. § 655(b)(8), *supra.*

■ Even if the argument is restricted to significant or substantial changes, it is plain that, in order to challenge a regulation as invalid, a person or company must demonstrate some identifiable stake in the outcome apart from a generalized uneas-

iness that the regulation is somehow wrong. *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Simplex cannot object to a regulation which does not affect it in this case merely because it finds the procedure by which that regulation was adopted to have been irregular.

In only one instance has Simplex noted an arguably significant difference between the standard adopted by the NFPA and that promulgated by the Secretary involving a regulation important to this case. Simplex has standing to challenge that regulation, 29 C.F.R. § 1910.107(a). The NFPA source standard for § 1910.107(a) contains the following definitions:

> 104. *Spraying Area.* Any area in which dangerous quantities of flammable vapors or mists, or combustible residues, dusts or deposits are present due to the operation of spraying processes.
>
> A spray area includes:
>
> (a) The interior of spray booths as specifically provided in Section 1104.
>
> [ (b) and (c), further specifications, and an explanatory note deleted.]
>
> 105. *Spray booth.* A power-ventilated structure provided to enclose or accommodate a spraying operation, to confine and limit the escape of spray, vapor and residue, and to safely conduct or direct them to an exhaust system.

concluded that even procedural challenges to a safety standard can be raised in enforcement proceedings. The Third and Fourth Circuits apparently agree. *See Atlantic & Gulf Stevedores v. OSHRC,* 534 F.2d 541, 550 (3d Cir.1976) (dictum) (OSHRC may deny enforcement of a standard it determines to have been issued "in violation of [OSHA's] substantive or procedural requirements"); *Daniel International Corp. v. OSHRC,* 656 F.2d 925, 930 (4th Cir.1981) (deciding procedural challenge in enforcement proceeding). We have considered the evidence of congressional intent put forward in these cases, and we agree with the majority view that Congress intended review of the validity of section 6 standards to be available in enforcement proceedings before the Commission, and that Congress drew no distinction between procedural and substantive challenges in this regard. *See Deering Milliken,* 630 F.2d at 1099 (discussing legislative history); *Atlantic & Gulf Stevedores,*

534 F.2d at 548–49 (same). We note that this interpretation does not rob section 6(f) of all exclusivity—for no *pre-enforcement* challenges to a standard can be entertained in the courts of appeals unless the requirements of section 6(f) are met. We also emphasize that we are doing no more than interpreting congressional intent as to the preclusive effects of OSHA's provision for pre-enforcement review. Thus, we express no opinion as to the interpretation of any other statutes that include similar provisions. *See generally Aluminum Co. of America v. ICC,* 761 F.2d 746, 751 (D.C.Cir.1985) (noting but not resolving "the apparent conflict in the expression of our cases on the question whether, in the course of an appeal from an agency decision applying a rule to a specific set of facts, we may entertain a challenge to the rule itself after the jurisdictional deadline for direct review of the rule has expired") (citations omitted).

NFPA No. 33–1968, *Standard for Spray Finishing Using Flammable and Combustible Materials* 33-5-7 (1969). Section 1910.107(a) (definitions applicable to this section) corresponds to this portion of the NFPA source standard. Section 1910.-107(a)(3) tracks ¶ 105's definition of spray booth exactly. Section 1910.107(a)(2), however, incorporates only the first portion of ¶ 104's definition of spray area, omitting the language expressly providing that a spray booth is a spray area.

Simplex derives two arguments from this alteration. First it suggests that the Secretary cannot enforce a modified national consensus standard promulgated without the 29 U.S.C. § 655(b) procedures. Second, it contends that, under the regulation as modified, Simplex has not violated any standards; its argument is that it has been charged with violations of standards involving spray areas and not spray booths which, under the Secretary's regulation, are not the same thing.

■ A close reading of § 1910.107 rebuts those points.[3] Most of the section either applies to spraying operations generally or to spraying areas. Certain provisions which are specially applicable to spray booths are also included, but it is clear that the omission of the NFPA provision expressly including spray booths in spray areas was not at all designed to remove booths from the general clauses dealing broadly with spraying operations and areas. For example, § 1910.107(d)(2) states generally that all spraying areas must have exhaust systems; § 1710.-107(d)(3) *adds* to § 1710.107(d)(2) the specification that each spray booth shall have an independent exhaust duct system. If we were to read the provision relating to spray booths *separately* from those relating to spray areas, the booths would be required to have separate exhaust systems, but they would not have to work very well since the specifications regarding the power of the ventilation system refers only to spray areas. Similarly, a spray booth must be constructed so that all areas are accessible for cleaning (§ 1910.107(b)(9)), but, by Simplex's argument, the booth need not be cleaned since the regulation which requires cleaning refers only to spraying areas (§ 1910.107(g)(2)). Simplex's argument thus takes a fairly clear regulation and creates an irrational hodgepodge of *non sequiturs*. We are satisfied, rather, that the Secretary omitted the specific inclusion of spray booths within spraying area simply because he considered that extra definition to be unnecessary and redundant.

■ The Secretary need not adopt a national consensus standard verbatim, even under the shortened procedures of 29 U.S.C. § 655(a). "We reject outright the contention that the Secretary was required to promulgate existing national consensus or federal standards verbatim.... [O]ur inquiry is whether a substantially meaningful modification of the standard occurred during the transformation into an OHSA requirement." *Deering Milliken, Inc. v. OSHRC,* 630 F.2d 1094, 1110 (5th Cir.1980); *Modern Drop Forge Co. v. Secretary of Labor,* 683 F.2d 1105 (7th Cir.1982). Simplex has not demonstrated a substantial or meaningful modification of either the thrust of the regulation or the meaning which one in Simplex's line of business would ascribe to it. On the contrary, Simplex was properly cited for violations of regulations involving spraying areas because, under the definition of those areas, a booth *is* an area. The fact that the provision also contains particularized regulations for indoor spray areas (booths) in no way excuses the company from abiding by the consistent and applicable regulation for such areas in general. There was adequate notice that both portions governed spray booths. *See Fusibles de Puerto Rico v. OSHRC,* 658 F.2d 21 (1st Cir.1981).

### IV. AMENDMENT OF THE CITATION

Another of Simplex's contentions is that the ALJ improperly allowed the Secretary to amend the citation in OSHRC Docket No. 82–12 in violation of 29 U.S.C. § 658(c)

---

**3.** Section 1910.107 is 9 pages long.

which states: "No citation may be issued under this section after the expiration of six months following the occurrence of any violation." The OSHA inspection in this case ended on September 10, 1981. The original citation, issued December 10, 1981, charged Simplex with a violation of OSHA regulations "on August 6, 1981 [the date of the fire] and subsequent days." On June 15, 1982, nine months after the inspection, the ALJ allowed the Secretary to amend the citation to allege violations "from six months prior to the date of this citation [December 10, 1981] through on or about September 8, 1981." The amendment thus added a new time period—June 10 through August 5, 1981—to the period covered by the original citation.

The OSHA Act provides that "[u]nless the Commission has adopted a different rule, its proceedings shall be in accordance with the Federal Rules of Civil Procedure." 29 U.S.C. § 661(g). The only relevant Commission regulation provides that the Secretary must "set forth the reasons for amendment and . . . state with particularity the change sought." 29 C.F.R. § 2200.-33(a)(3). This Commission rule jibes with the applicable federal rule that leave to amend should be liberally granted absent prejudice to the opposing party. Fed.R. Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). This is particularly true in cases before the Commission: "Administrative pleadings are very liberally construed and very easily amended." *National Realty and Construction Co. v. OSHRC*, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1264 (1973).

■ If the amendment arises (as here) out of the same occurrence or transaction from which the original citation arose, Fed. R.Civ.P. 15(c) provides that the amendment relates back to the date of the original pleading. The amendment in the current case adds on a period of time no earlier than six months prior to the original citation. Therefore, under the relating-back provision of 15(c), the limitations period of § 658(c) is not violated.

In his motion to amend the complaint, the Secretary sought "to more accurately state the period during which certain standards were violated." The addition of the three months did not alter the underlying legal nature of the action, nor did it change the operative factual allegations at the center of this controversy. In situations where "the citation as amended alleged the same basic facts and circumstances and complained of the same omission by the employer as had the original citation and complaint," [4] the courts have allowed amendment to cover periods prior to those originally listed in the complaint and more than six months before the date of the amendment. *Dye Construction Co. v. OSHRC*, 698 F.2d 423 (10th Cir.1983); *St. Joe Minerals Corp. v. OSHRC*, 647 F.2d 840 (8th Cir.1981). These decisions should be followed unless Simplex can demonstrate some element of prejudice as a result of this particular amendment.

The only possible prejudice to which Simplex points is that the expanded scope of the pleadings allowed the Secretary to introduce evidence regarding conditions prior to the fire, evidence which might otherwise not be admissible. But this is precisely the purpose of many pleading amendments, and we can see no reason why Simplex's defense to the basic allegations—failure to abide by Administration regulations—was hampered by this amendment. The ALJ granted the amendment months before the hearing, leaving Simplex plenty of time to adjust its defense and prepare to respond to any new matters which might arise. Simplex clearly should have known that the Secretary's case would include as an issue the state of Building 11 prior to the fire and not merely on the very date the fire occurred. In a word, the company has not demonstrated that it was surprised or prejudiced by the amendment. *Cf., Dye Construction Co., supra*, 698 F.2d at 425 (amendment to include the date of an accident on the company's worksite was proper even though it was more than six months

---

**4.** *Southern Colorado Prestress Co. v. OSHRC*, 586 F.2d 1342, 1346–47 (10th Cir.1978).

prior to the amendment because the company knew of the accident, knew the investigation was made because of the accident, and "[n]o new facts or theories in of the citation or new violations were alleged").

## V. THE ALJ'S REFUSAL TO CALL SIMPLEX'S WITNESSES

Simplex's last general objection concerns an order by the ALJ prohibiting Simplex from calling as witnesses certain Department of Labor officials and recalling some of the Secretary's witnesses who had already testified.

On March 8, 1982, the ALJ issued an order directing the parties to submit witness lists. On October 11, 1982, the Secretary submitted a list. Four days later, Simplex filed a letter in which it stated that it did not plan to call any witnesses not already on the Secretary's list, though it might decide to call rebuttal witnesses. On October 28, 1982, the eighth day of the hearing, Simplex submitted a list of 33 persons whom it planned to call. The list included the Solicitor of Labor, the Secretary's Chief of Staff, the Regional Administrator for the Administration, and the Administration's Area Director; also named were witnesses who had already testified. The Secretary objected to Simplex's list.

The ALJ issued the order contested here on December 15, 1982. He struck from Simplex's list the four Department of Labor officials and all others who had already testified. As to the former, the ALJ ruled that any testimony which these officials might provide would be irrelevant since they had no first-hand knowledge of the facts of this case. Moreover, he held that their testimony on OSHA and Administration policies was unnecessary and unduly burdensome as such policies were available from various publications. As to the other persons struck from Simplex's list, the ALJ held that their testimony would be cumulative and unnecessary given their extensive testimony during initial direct examination and cross-examination. The ALJ, however, allowed Simplex to present an offer of proof regarding the expected scope of the witness' testimony.

The ALJ did not err or abuse his discretion with respect to the recall of the Secretary's witnesses. He stated that "their testimony would inevitably be cumulative of other testimony of the same kind bearing on the same points." Review of Simplex's offer of proof shows that there was no abuse of discretion. On a number of the proffered points, Simplex eventually prevailed. Other expected testimony concerned matters well-ploughed in the initial direct examination and Simplex's cross-examination. On this record, we cannot conclude that the ALJ treated Simplex unfairly. *See, e.g., Batsell v. United States*, 403 F.2d 395, 402 (8th Cir.1968), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969) (after lengthy cross-examination by defense, trial court did not err in refusing to recall prosecution witness); *accord, United States v. DeRosa*, 670 F.2d 889, 896 (9th Cir.), *cert. denied sub nom. Bartman v. United States*, 459 U.S. 993, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982).

The ALJ's refusal to allow Simplex to call as witnesses top Department of Labor officials fits within the rule enunciated by the Supreme Court in *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941), that top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions. This court came to a similar conclusion in a case regarding the administration of the Food Stamp Program. The court ruled that the district court had jurisdiction to review the Secretary of Agriculture's decisions, but cautioned in a supplemental opinion on rehearing that "subjecting a cabinet officer to oral deposition is not normally countenanced." *Peoples v. United States Department of Agriculture*, 138 U.S.App.D.C. 291, 427 F.2d 561, 567 (1970). Other courts have also refused to allow examination of top Government officials regarding decisions committed to their discretion. *Sweeney v. Bond*, 669 F.2d 542, 546 (8th Cir.), *cert. denied sub*

*nom. Schenberg v. Bond,* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982) (plaintiffs could not depose Governor of Missouri regarding his dismissal of plaintiffs from their employment); *Kyle Engineering Co. v. Kleppe,* 600 F.2d 226, 231–32 (9th Cir. 1979) (in contract dispute with Government, trial court did not err in vacating notice of deposition of administrator of government agency); *United States Board of Parole v. Merhige,* 487 F.2d 25, 29 (4th Cir.1973) (inmates could not take depositions of parole board members absent "exceptional circumstances"), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *Warren Bank v. Camp,* 396 F.2d 52, 56 (6th Cir. 1968) (bank could not depose Comptroller of the Currency in order to determine his reasons for granting a bank charter).

Simplex has not suggested any information in the possession of these officials (regarding general enforcement proceedings) that it could not obtain from published reports and available agency documents. From its brief we gather that Simplex wishes to question these officials on purely discretionary decisions concerning enforcement of the OSHA Act. This runs counter to the cautions enunciated in *Morgan, supra, et al.* Having been shown no urgent or proper need to question these officials, the ALJ permissibly denied the company's request.

## VI. Substantial Evidence

Simplex says that, even if its general objections to the Commission's proceedings fail, the Commission had insufficient evidence to support the Secretary's charges. By statute, we are constrained to uphold the Commission's findings of fact "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a). The record leads us to conclude that the Commission based its factual findings on sufficient evidence.

The first two charges decided adversely to Simplex (items 1 and 2 of citation 1), center on 29 C.F.R. § 1910.106(e)(6)(i) and

(ii).[5] Entitled *"Source of ignition,"* § 1910.106(e)(6) provides in pertinent part:
(i) *General.* Adequate precautions shall be taken to prevent the ignition of flammable vapors....
(ii) *Grounding.* Class I liquids [*i.e.,* flammable liquids having a flashpoint below 100° F.] shall not be dispensed into containers unless the nozzle and container are electrically interconnected [to prevent sparks].

The specifics of the charges state that Simplex's employees did not wear electrically conductive footwear while working in the manual spray booth in violation of § 1910.-106(e)(6)(i), and that employees working in the manual spray booth, in violation of § 1910.106(e)(6)(ii), did not use grounded manual spray guns.

■ The company's contentions on appeal split extremely fine hairs. The ALJ determined that a violation exists if the Secretary can show "the presence of the flammable liquid or vapor and a source of ignition." Simplex argues that the Secretary cannot establish a violation absent *specific* proof that the vapors and the source of ignition are likely to be in the same place and that the source of ignition is likely to provide energy of sufficient intensity to ignite the flammable substance. This argument is too demanding. Under its terms no violation of § 1910.-106(e)(6)(i) has occurred if one takes appropriate precautions to keep all sufficient sources of ignition away from a Class I liquid. A general determination, as here, that the source of ignition and flammable vapors are likely to meet is sufficient to support a finding of a violation of that provision. For its part, § 1910.106(e)(6)(ii) is quite specific as to its requirements and does not call for any more detailed findings.

■ The ALJ found that Simplex used a significant quantity of lacquer thinner in the manual and electrostatic spray booths having a flashpoint of 25° F.—obviously less than 100° F. The ALJ relied

---

**5.** Section 1910.106 is a harrowing 53 pages long.

upon Simplex's own written procedures for the conclusion that its employees were not wearing appropriate shoes in light of the fact that they might become statically charged causing sparks when they neared the spray guns. The ALJ also relied upon Simplex's insurance underwriter's loss reports and the spray gun instruction manual (known to Simplex) for the proposition that the liquid flowing through the line can create an electrical charge which might spark when brought near either a vessel with which it was not interconnected or a statically charged employee. On the record as a whole, the ALJ's conclusion on these charges was supported by substantial evidence.[6]

■ Item 3 of citation 1 charges Simplex with a violation of § 1910.107(b)(7):

*Conveyors.* Where conveyors are arranged to carry work into or out of spray booths, the openings therefor shall be as small as practical.

Simplex's conveyor passed from booth to booth through openings measuring seven feet high by three feet wide. The parts which Simplex manufactured measured from less than one foot on all sides to approximately seven feet by four feet by six inches. The ALJ found, based on the testimony of the Secretary's expert witness, that a recommended clearance of three to six inches is preferable. The ALJ also found that most Simplex parts pass through the openings with a much greater clearance—indeed, the record suggests that the clearance may at times be as great as several feet. The ALJ posited that metal panels attached to the conveyor openings would effectively reduce the clearance for the smaller parts. Again, we cannot say on this record that the ALJ's finding of a violation was erroneous.

■ The last violation found by the ALJ (at issue here) concerns 29 C.F.R. § 1910.107(g)(2):

*Cleaning.* All spraying areas shall be kept as free from the accumulation of deposits of combustible residues as practical, with cleaning conducted daily if necessary. Scrapers, spuds, or other such tools used for cleaning purposes shall be of nonsparking material.

The ALJ relied upon the testimony of Simplex employees for his determination that Simplex used metal scrapers to clean the concrete floors of the booths, scrapers which could produce sparks. Simplex's primary contention is that these tools never previously sparked. The fact that the hazard which the regulation protects against has never occurred is no defense to the violation. Many of the Secretary's regulations are preventive in nature, and enforcement would be meaningless if Simplex's argument were accepted.

■ Nor are we persuaded by Simplex's argument that the Government neglected to establish, as an element of its case, Simplex's knowledge of the violations. The cases which Simplex cites for the employer-knowledge requirement do not mandate that the Government prove actual knowledge in every instance. Rather, they assert that the employer cannot be held liable for a violation of which it had no knowledge, and need not have knowledge. For example, in *Brennan v. OSHRC*, 511 F.2d 1139 (9th Cir.1975), the Commission found that the acts which constituted the violations were committed by employees in direct violation of the employer's instructions. The evidence established that the employer had no knowledge of the employees' disobedience. *Id.* at 1141. The court concluded that the employer could not be held responsible for violations of which it was reasonably unaware. "Fundamental fairness would require that one charged with and penalized for violation [*sic*] be shown to have caused, or at least ac-

---

**6.** The ALJ properly held that these two changes were correctly brought under § 1910.106 rather than § 1910.107. The terms of § 1910.106 specifically apply and are no less specific than those of § 1910.107. In any event, the company "would have been cited *irrespective of which* standard was applied" (*L.R. Willson & Sons, Inc. v. OSHRC*, 225 U.S.App.D.C. 341, 698 F.2d 507, 516 (D.C.1983) (emphasis in original)), and the ALJ was right to say there was "no practical significance" in the choice of one standard over the other.

quiesced in, that violation." *Id.* at 1145. In sharp contrast, the Administration cited Simplex for violations based on physical conditions and on practices in its spray booths which were readily apparent to anyone who looked—and indisputably should have been known to management. *L.R. Willson & Sons, Inc. v. OSHRC*, 225 U.S. App.D.C. 341, 698 F.2d 507, 510, 513 (1983). This is not a situation in which the employer's actual knowledge is relevant.[7]

## VII. THE SECRETARY'S CROSS-PETITION

The Secretary's cross-petition requires us to consider two questions. First, whether the violations found here were necessarily "serious" under the definition in the Act, as contended by the Secretary, or nonserious as the ALJ found. Second, we must decide whether an individual who enters a hospital for treatment or examination, yet leaves the same day, is "hospitalized" for the purposes of an Administration reporting provision.

### A. *The character of Simplex's violations.*

The Act provides that

a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

29 U.S.C. § 666(k). In *National Realty and Construction Co. v. OSHRC*, 160 U.S. App.D.C. 133, 489 F.2d 1257, 1265 n. 33 (1973), this court summarized the criterion for review of a Commission determination regarding seriousness: "If evidence is presented that a practice could eventuate in serious physical harm upon other than a freakish or utterly implausible occurrence of circumstances, the Commission's expert determination of likelihood should [control]."

■ This ruling emphasizes two points of relevance here. First, the Secretary must present evidence establishing that a violation fits within the statutory definition. Second, the Commission's "expert determination" is not to be lightly brushed aside.

■ In his opinion, the ALJ followed the controlling principle that the Secretary must affirmatively demonstrate the "substantial probability that death or serious physical harm could result" from the violation. He concluded:

While the existence of a hazard is presumed when the express terms of a standard are not met, the extent of the hazard may not be assumed without proof. The evidence—both direct and circumstantial—does not support the conclusion, without indulging in conjecture, that death or serious injury could have been a substantially probable consequence of the failure to either wear conductive shoes, ground flammable liquid containers, reduce the size of conveyor openings, or use nonsparking cleaning tools.

Jt.App. 28–29. Whatever the proper interpretation of the statutory definition of a "serious violation," *supra*, the Secretary has provided no ground for disturbing this factual conclusion. The Secretary's main contention is that an employee did in fact die in a fire. The Secretary, however, takes several leaps in his argument—primarily when he assumes without proof that these violations were the cause of the fire. The ALJ was certainly aware of the fire and the surrounding circumstances. He specifically concluded that the Secretary

---

**7.** There was likewise sufficient proof of the other elements challenged by Simplex. Proof of violation of the specific standards (plainly directed to worker safety) adequately demonstrated the existence of hazard. The feasibility of correcting the violations and the time allowed for their abatement were sufficiently deduced from the company's own practices and the evidence of record. Finally on this aspect of the case, we do not find any material variance between the Administration's citations and the ALJ's findings that violations had occurred.

failed to present evidence that *these* violations were connected with that particular death or would likely lead to death or serious physical harm. We have no reason to upset his decision.

### B. *The reporting requirement.*

■ The citation in Docket No. 82–301 charges Simplex with violating the OSHA reporting regulation which states:

> Within 48 hours after the occurrence of an employment accident ... which results in hospitalization of five or more employees, the employer of any employees so injured ... shall report the accident [to the appropriate OSHA Area Director].

29 C.F.R. § 1904.8. The parties agreed to the following facts on which this charge was based: Essentially, between February 5 and 11, 1982, seventeen employees in Simplex's printed circuit department fell ill from exposure to low levels of natural gas. One employee remained in the hospital from February 5 through February 14. Respondent sent sixteen other employees to the hospital, each of whom was released on the day of the examination. The ALJ concluded that the term "hospitalization" as used in the regulation means admission to a hospital on an in-patient basis. He found therefore that Simplex did not violate the regulation since only one employee was hospitalized in that sense.

"Hospitalization" is not a technical term for which we have to look to administrative experts for guidance as to its meaning. The common meaning of the term is clear; "to hospitalize" means "to place in a hospital as a patient." Webster's Third New International Dictionary (1968). This definition comports with the ALJ's conclusion that the phrase refers to admission to a hospital as an inpatient.

In addition, the ALJ's view comports with the purpose of the regulation. The Secretary promulgated the regulation under the authority of 29 U.S.C. § 657(c), which provides *inter alia* that the Secretary "shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor illnesses." At the time the regulation entered into force, the Secretary noted that it required the "report[s] of *serious* accidents." 36 Fed.Reg. 12612 (1971) (emphasis added). The ALJ's interpretation seems well-suited to this objective since it would not require employers to report incidents which result in only inconsequential injuries, or where, out of an abundance of caution, employees seek a hospital examination after a work-related accident.[8] The interpretation that "hospitalization" implies in-patient status, and something more than a stop in a hospital emergency room, serves to separate the serious from the nonserious injuries.

### VIII. WILLFULNESS

■ Simplex seeks review of that portion of Docket 82–12 concerning Simplex's willful violation of applicable OSHA cleaning standards.[9] The Secretary correctly argues that we have no jurisdiction to review this matter because it has not yet become a final order of the Commission. The Act provides that the ALJ's report shall become the Commission's final order within thirty days after issuance of the report "unless within such period any Commission member has directed that such report shall be reviewed by the Commission." 29 U.S.C. § 661(j). Because a Commissioner directed review as to this matter, it has not yet become a final order of the Commission. The Act is very specific with regard to our jurisdiction, and provides that

---

**8.** Of course, we do not consider whether the Secretary could promulgate a regulation which requires the employer to report hospital entries of any kind.

**9.** Simplex argues that the Commission directed review only of the willfulness of the violation, not of the *factual* existence of the violation. It seeks review here solely of the latter. Those two aspects are so intertwined, however, that we read the Commission as reserving to itself the whole question of the facts, validity, and nature of the alleged violation.

we may review only "an order of the Commission issued under subsection (c) of section 659 of this title." 29 U.S.C. § 660(a). 29 U.S.C. § 659(c) states that the Commission shall issue an order in a case, which will become final thirty days after issuance. As we have as yet no final order of the Commission regarding that portion of Docket No. 82–12 which was severed and for which a Commissioner directed review, we have no jurisdiction to consider the points Simplex raises.

For these reasons, the Commission's decision regarding those issues for which proper appeals have been taken is affirmed.

*Affirmed.*

WALD, Circuit Judge, dissenting only as to Part VII(A):

I concur in Judge Davis' excellent opinion except for Part VII(A), which upholds the administrative law judge's finding that the violations were not serious. I believe the administrative law judge applied an incorrect legal standard to determine whether the violations were serious, and that if the right standard is applied, his conclusion is probably not supported by substantial evidence.

A serious violation exists if, among other things, "there is a substantial probability that death or serious physical harm *could* result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use." 29 U.S.C. § 666(j) (emphasis added).[1] Courts have understood Congress' use of "could" rather than "would" to mean that the agency may find a serious violation if "a practice could eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances." *National Realty & Constr. Co. v. OSHRC*, 160 U.S. App.D.C. 133, 489 F.2d 1257, 1265 n. 33 (1973). "Where violation of a regulation renders an accident resulting in death or serious injury possible, however, even if not probable, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation. Where human life or limb is at stake, any violation of a regulation is 'serious.'" *California Stevedore & Ballast Co. v. OSHRC*, 517 F.2d 986, 988 (9th Cir.1975); *cf. Phelps Dodge Corp. v. OSHRC*, 725 F.2d 1237, 1240 (9th Cir.1984); *St. Joe Minerals Corp. v. OSHRC*, 647 F.2d 840, 847 (8th Cir.1981). Thus, I believe that to prove a serious violation, the Secretary need show only a substantial probability, and not a certainty, that a cited condition is capable under other than freakish or utterly implausible conditions of leading to death or serious physical harm.[2] In my view, the evidence in this case satisfied that standard.

An employee actually died from injuries sustained in a fire in these spray booths. While the Secretary did not show that the violations caused that fire, he did show that the violations could cause a fire. The question then is whether such a fire could cause serious harm or death. On that issue, the employee's death does have probative force.

More importantly, the evidence showed that the spray booths were a dangerous

---

**1.** A violation is not serious if the employer "did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(j). It is clear from the record that Simplex knew or should have known of the cited conditions in this case.

**2.** *Cf. Standard Glass & Supply Co.*, 2 O.S.H.R.C. 1488 (1973). Later cases have summarized the *Standard Glass* test by stating that the Secretary must show "that if ... an incident occurs, the probable result will be either serious injury or death." *Bethlehem Steel Corp.*, 1981 O.S.H. Dec. (CCH) ¶ 25,645 at 31,987 (citation omitted), *peti-*

*tion denied mem.*, 688 F.2d 818 (3d Cir.1982); *see also Anaconda Aluminum Co.*, 1981 O.S.H. Dec. (CCH) ¶ 25,300 at 31,347–49. This shorthand formula should not, however, be interpreted to require proof that in a high proportion of accidents resulting from the cited condition, death or serious injury would occur. Were it so, a violation that caused many accidents, but only a few resulting in serious injuries, would be nonserious, while a violation that caused only a few accidents, all of which resulted in serious injuries, would be serious. That makes no sense at all.

firetrap. Thick accumulations of flammable paint residue covered the ceilings, walls, and floors of all three booths; stalactites of paint two to three inches long hung from the ceilings. "[H]ighly volatile" flammable lacquer thinner, *see* Transcript of Hearing at 632, was used for cleaning and often pooled on the floors of the booths. "There is always a possibility of producing a spark when you have a worker in a booth cleaning, and if he is using highly volatile substances to assist the cleaning, there is the possibility of a fire." *Id.* "[The ventilation system] was not adequate ... to remove those vapors, so the hazard there was very very great, ... by ... using a lacquer thinner with a flashpoint of 4° or less. Astronomical, in fact." *Id.* at 2071. During some kinds of operations, the Simplex spray painting guns could arc, creating a potential source of ignition, as often as "two or three times maybe within an hour's time." *Id.* at 291. A fire could be started "[b]y using the spark-producing scrapers, generating a spark, igniting the vapors from the flammable liquid being the lacquer thinner and the paints." *Id.* at 1750. Similarly, if an employee not wearing conductive shoes used the spray gun and then touched a grounded object, a spark could ignite these dangerous surroundings. *See id.* at 1660–64, 1669. The illegally large partition openings heightened all these dangers: because of these openings, and "because with the electrostatic spray painting operation ... where sparks and arcs could be generated and because of the flammable vapors that ... were present [and] could be ignited and because with the manual spraying booth ... adjoining ... the electrostatic spray painting booth, those vapors could be ignited and ... the employee in Manual Spray Booth No. 1 could be burned." *Id.* at 1916–17.

I believe this and similar evidence makes out a strong case that if a worker caused a spark while cleaning the booth, he was at genuine risk of suffering serious burns in any resulting fire.

The majority relies on the administrative law judge's "factual" conclusion that "the evidence ... does not support the conclusion ... that death or serious injury could have been a substantially probable consequence" of the cited conditions. *See* Maj.Op. at 589. This phrasing suggests to me that the administrative law judge erroneously required a high likelihood that death or serious injury would result from the cited conditions themselves. At the very least, we face an opaque and conclusory statement by the administrative law judge, unaccompanied by citations to relevant authorities, that is cast in great doubt by compelling and essentially uncontradicted record evidence. I would remand for an explicit application of the governing law to the facts proved by the Secretary.