United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 12, 2005**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 8, 2005

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-20001
_____

In Re:  United States of America,

Petitioner.

_____

Petition for Writ of Mandamus to the
United States District Court
for the Southern District of Texas, Houston

_____

Before JONES, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:

In this case, the Government has requested a writ of mandamus to prevent the federal district court from enforcing discovery orders in a federal death penalty case not by dismissing the Government's Notice of Intent to seek the death penalty against this defendant, but by poisoning the jury's consideration of that option with an impermissible punishment phase instruction.  The court also threatened to delay the scheduled start of the proceedings for a year.  For the following reasons, we grant the writ, and expect proceedings to resume promptly.

## Background

Defendant Tyrone Mapletoft Williams ("Williams") is awaiting trial for his alleged role in an illegal alien smuggling

conspiracy that resulted in the deaths of nineteen undocumented aliens. According to the indictment, on or about May 13, 2003, after several co-conspirators loaded seventy-four illegal aliens into an enclosed trailer at or near Harlingen, Texas, Williams and co-defendant Fatima Holloway, the only two African-American participants, drove the tractor-trailer rig to a prearranged destination at or near Victoria, Texas. Williams was the driver and Holloway was sitting in the passenger seat.

As alleged, during the trip, several aliens began to bang on the locked trailer, begging to be released from the oppressive heat inside. As the aliens screamed for mercy, Holloway allegedly told Williams to turn on the refrigeration device in the trailer, or, alternatively, to let the aliens out. Williams allegedly rejected these requests and continued to drive. The Government alleges that as a direct result of this decision nineteen of the aliens died from heat exhaustion and/or suffocation.

On March 15, 2004, a grand jury in the Southern District of Texas returned a sixty-count superseding indictment charging all fourteen co-defendants with various alien smuggling offenses in violation of 8 U.S.C. § 1324. Because of the deaths of some of the illegal aliens, nearly all defendants involved in the transportation were death penalty-eligible. 8 U.S.C. § 1324(a)(1)(B)(iv). On the day the grand jury returned the superseding indictment, the United States filed a Notice of Intent

to Seek the Death Penalty only against Williams.[1]  Two days later, Judge Vanessa Gilmore severed Williams's case[2] and set his trial for January 5, 2005.

On October 22, 2004, Williams filed a Motion to Dismiss the Notice of Intent to Seek the Death Penalty, or alternatively, for Discovery of Information Relating to the Government's Capital-Charging Practices.  Williams's motion substantively states:

> The United States of America has determine [sic] to seek the death penalty against TYRONE MAPLETOFT WILLIAMS because of his race.
> According to the original and superceding [sic] indictment returned in this case, TYRONE MAPLETOFT WILLIAMS is the only person of African-American descent, other than FATIMA HOLLOWAY, who was indicted for activity relating to the facts and circumstances charged in the indictment.  Upon the original return of the indictment, the United States of America made many far-reaching and profound statements which had the pendency [sic] to demonize many of the alleged participants in the activity that resulted in the indictment.  All of the other persons mentioned in the indictment are of Hispanic

---

[1]  Before filing the Notice, the Government went through the protocol required by the Department of Justice (DOJ) before a United States Attorney may seek the death penalty in the case.  This requires the U.S. Attorney to seek the opinion of the Capital Crimes Unit in Washington, D.C., and final approval from the United States Attorney General.  This process began when the grand jury returned the initial indictment on June 12, 2003.  Interestingly, while pursuing this procedure, the United States submitted an unopposed motion to extend the death penalty notice deadline, which Judge Gilmore denied.  Judge Gilmore did not reconsider this motion and grant an extension until after the Government filed an unopposed motion to reconsider and United States Attorney Michael Shelby personally appeared before her to explain the delay.

[2]  The status of the co-defendants varies.  Some have pled guilty, others have apparently fled the country and have not yet been served with arrest warrants, and still others have been found guilty at trial.  One co-defendant, Claudia Araceli Carrizales-Gonzales, was ordered immediately released by Judge Gilmore on the last day of trial based on the judge's ruling that the Government failed to prove one of the elements of its case.  This order was entered despite the Government's vociferous objection.  Another co-defendant awaits trial after being severed from the original co-defendants upon Judge Gilmore's willingness to suppress her confession.  The Government has appealed that decision.  United States v. Cardenas, No. 04-20449.  We express no opinion as to the other cases.

descent and none are African-American. Of the persons who are alleged to have concocted the conspiracy, profited greatly from the conspiracy and who undertook a leadership role in the conspiracy, none are African-American. Of all the persons named in the indictment, the Government is seeking the death penalty only as to TYRONE MAPLETOFT WILLIAM [sic].

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays that the Notice of Intent to Seek the Death Penalty be dismissed, that the Notice of Special Findings be stricken, or, in the alternative, that the Court provide an evidentiary hearing at which time the Defendant will make a credible showing that all of the similarly situated individuals in this indictment are of a different race and not subjected to the death penalty, and the Defendant further prays that the Court grant this Motion for Discovery of Information Relating to the Government's Capital-Charging Practices, and for such other relief to which he may show himself entitled.

Williams also filed a Memorandum of Points and Authorities in Support of his motion, which states in its entirety:

In United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480 (1996), the United States Supreme Court held that a defendant who seeks discovery on a claim of selective prosecution must show some evidence of discriminatory effect and discriminatory intent. United States v. Bass, 536 U.S. 862, 122 S.Ct. 2389 (2002). The Defendant in this case will not rely upon a statistical showing based upon nationwide information relating to the way the United States charges blacks with death-eligible offenses in comparison to the way that they charge whites. In this case, the discriminatory effect and discriminatory intent are clear to the naked eye. Similarly situated persons are treated differently and they are named in the same indictment with this Defendant. A prima facia [sic] case is made by the indictment itself.

Under the equal protection component of the Fifth Amendment's Due Process Clause, the decision whether to prosecute may not be based on an arbitrary classification, such as race or religion. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505-06. In order to prove a selective-prosecution claim, this Defendant must demonstrate that the prosecutorial policy had a discriminatory effect and a discriminatory purpose. Ibid. To establish a discriminatory effect in a race

4

case, this Defendant must show that similarly-situated individuals of a different race were not prosecuted. <u>Ah Sin v. Wittman</u>, 198 U.S. 500, 25 S.Ct. 756, <u>Batson v. Kentucky</u>, 476 U.S. 79, 109 S.Ct. 1712, <u>Hunter v. Underwood</u>, 471 U.S. 222, 105 S.Ct. 1916, distinguished. The Court, in <u>Armstrong</u>, ruled that a defendant must produce credible evidence that similarly-situated defendants of other races could have been prosecuted, but were not. In the <u>Armstrong</u> case, the Court held that the required threshold was not met. In this case, that threshold is met on its face. It is abundantly clear that TYRONE MAPLETOFT WILLIAMS is black and is the only person for whom the death penalty is being sought. It is abundantly clear that all of the other Co-Defendants are not black, with the exception of FATIMA HOLLOWAY.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully prays that this Court grant his Motion to Dismiss and Strike, or in the alternative, the Motion for Discovery, and grant him an evidentiary hearing in order that he may make a prima facia [sic] case on the allegations contained in his Motion, which is filed contemporaneously with this Memorandum of Points and Authorities in support of same.

After summarily declaring that Williams had made a prima facie case under <u>Armstrong</u>, Judge Gilmore granted Williams's vague "Motion for Discovery of Information Relating to the Government's Capital-Charging Practices." After a series of clarifications,[3] Judge Gilmore declared that the Government was required to produce information that "relates generally to the capital charging practices of the Attorney General of the United States including but not limited to the charging practices that were employed in this specific case." Nov. 10, 2004, Order. Judge Gilmore noted that her order did "not, however, prohibit the Government from

---

[3] Initially, Judge Gilmore explained that the order's language on "capital charging practices" was "inclusive of this case but not this case exclusively." Status Conference, Nov. 1, 2004, Tr. at 17. The scope of discovery grew at the November 10 status conference, as indicated above.

5

raising any <u>legitimate</u> objections based on privilege or work product." <u>Id.</u> (emphasis in original).

Attempting to comply with Judge Gilmore's order, the Government on November 24, 2004, filed a "Notice of Discovery in Response to Court Order," which discussed the United States Attorney's protocol for federal death penalty prosecutions, including how the determination to seek the death penalty is made. The filing included statistical information about the capital charging practices of the Attorney General. At a November 29, 2004, status hearing, Judge Gilmore rejected the Government's filing as non-responsive, and expressed anger at the Government's lack of compliance and refusal to assert privilege with specificity.[4] The United States then filed an Addendum, in which

---

[4] <u>See, e.g.</u> Tr. at 18:
. . . my specific instructions and our discussions were that [the discovery order] applied to this case and generally; but to the extent that there was any claim of privilege or work product, that that claim could be made in response to making discovery, and that the United States could specifically say, "[T]here were other things that occurred, but we are making this privilege or that privilege claim." But no privilege claim was made and then no information was provided.

Tr. at 20:
I said, if you have something for which you think that there is a claim of a privilege, then you need to tell me what it is. You didn't bother to even say that. I mean, nowhere in here did you say, "There were other things that we considered; and we did not produce them or disclose them in discovery even though we were ordered to do so, and here's the privilege we're claiming." That's all I asked you to do. Because the way that it is now, it's sort of like a thumb your nose at the Court kind of response.

Tr. at 23:
No. Stop. I don't care about that stupid motion for reconsideration. I didn't think you should have filed it anyway. I thought that you were being, you know, obtuse when you filed that motion for reconsideration. All I care about is the discovery. To me that [deliberative] information should have been filed here. . .I

6

it formally asserted privilege as to all other information rendered discoverable by Judge Gilmore. The Government specifically asserted privilege under the theories of deliberative process, work product, and attorney-client privilege.

On December 16, Williams responded by filing a Motion for Contempt, and moved in the alternative to dismiss the Death Notice. Williams attached a "report" of about sixty-eight other cases involving alien smuggling and asserted that the defendants in those cases were "similarly situated" with Williams. At a status hearing the next day, Judge Gilmore praised the information, commenting to the Government that "[t]he information that he got from this other guy is exactly the kind of stuff y'all should have been giving. That's better information than what y'all gave." Tr. at 14. When the Government attempted to refute the information contained in the exhibit, Judge Gilmore stopped the Government attorneys and instead asked why they had not complied with her discovery order.[5] After additional attempts by the Government attorneys to explain that

---

am not asking what [the Attorney General of the United States's] thought process were [sic] when he looked at the facts. We just want the facts. I don't care what he was thinking about.

[5] See, e.g., Tr. at 17:
Y'all are just kind of piddling around, piddling around trying to make up your mind if you can just kind of get away with not giving it. . . . So, you have just sort of looked at my order and then said, disclose the information about why you sought the death penalty on this guy, the only black defendant, and not anybody else based on the defendant's motion, and tell me what the rationale and what the thinking was. And then you said, "Yes, I will. I understand your order." And you walked out of here and basically said, "Phff. We got problems with it; it's separation of powers. We are just not going to basically do it." That is contempt. Mr. Washington [Williams's counsel] is right.

they were asserting privilege, based on their own analysis and after consultation with Department of Justice officials in Washington, the following exchange occurred:

> The Court:  Well, then you tell them [the DOJ officials in Washington] to write me a letter, because if they don't you're getting held in contempt.  I want a letter on my desk this afternoon from them saying, from the Attorney General that needs to be signed saying that they are refusing to comply with the Court's order, and that the reason that you can't do it is because the Attorney General of the United States has ordered you not to do so.
>
> Mr. Roberts: Okay, well, Your Honor, I am here as a representative of them; and I am advising you that we are not going to comply with this order.
>
> The Court: No.  That is not good enough.  Otherwise you are going to be in contempt this afternoon.  I need it in writing; it needs to be signed by the Attorney General saying that the reason that you as an Assistant United States Attorney in Houston cannot comply with my order is because the Attorney General of the United States  is prohibiting you from doing so based on separation of powers theory; that you will not disclose to this Court the basis upon which you chose in this case to indict the only black defendant for a death penalty crime in a case in which 14 defendants were involved in this smuggling and in which he was not the leader or the organizer or manager of this smuggling operation.  I need it in writing, and I need it today.  And if I don't have it by the end of the day, then you are going to be held in contempt.  Do you understand me?

Tr. at 19-20.

Mr. Roberts then attempted to bring up sanctions.  Judge Gilmore refused to address sanctions at that time, and then stated, "But presumably, you are going to just go back and get a letter from the Attorney General telling me to kiss their butt basically." Tr. at 21.  As we discern, Judge Gilmore's order, with a threat of

8

contempt behind it, required the Government to allow Williams access to its internal, privileged data concerning its use of its discretion in seeking the death penalty, or a letter from the Attorney General of the United States himself asserting privilege. Rather than supply this discovery, the Government continued to assert privilege and to explain why Attorney General Ashcroft would not be personally participating in the case.

On December 29, Judge Gilmore entered an order refusing to dismiss the Notice of Intent to Seek the Death Penalty, which the Government had proffered as an appropriate sanction. Cf. Armstrong, 516 U.S. at 1484 n.2 (noting that the Government suggested dismissing the indictment so that an interlocutory appeal might lie); see also United States v. Frye, 372 F.3d 729, 733-34 (5th Cir. 2004) (discussing the ability of the government to seek, and a court of appeals to hear, an interlocutory appeal where a district court strikes the death penalty pursuant to 18 U.S.C. § 3731). Instead, Judge Gilmore crafted a "sanction": a jury instruction which she intended to read to the jury during the punishment phase of the trial if Williams were found guilty:

> [The Government] failed and refused to obey an order of this Court that [it disclose to the Defendant information relating to the Government's capital charging practices and to the issue of whether the Government is seeking the death penalty against the Defendant because of his race.]
>
> The Court's order was a lawful one [].
>
> The refusal to obey the order is not sufficient to [dismiss the Government's Notice of Intent to Seek the Death Penalty.] You may consider the failure and refusal

9

of [the Government] to obey a lawful order of the Court, however, and may give it such weight as you think it is entitled to as tending to prove [that the Government is seeking the death penalty against the Defendant for discriminatory reasons.]

*****

If it is peculiarly within the power of [the Government] to produce [evidence relating to the Government's capital charging practices], failure to [produce that evidence] may give rise to an inference that this [evidence] would have been unfavorable to [the Government].  No such conclusion should be drawn by you, however, with regard to [evidence that] is equally available to both parties or where the [admission of the evidence] would be merely repetitive or cumulative.

The jury must always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

Order, Dec. 29, 2004.[6]  Judge Gilmore denied a motion for reconsideration, a motion for a stay, and a motion for a final order, and then ordered the case to proceed to trial as scheduled on January 5, 2005.

On December 31, the Government petitioned this court for a brief stay to enable the filing of a writ of mandamus concerning

---

[6]  Judge Gilmore further used this opportunity to excoriate the Government for its lack of decorum, and also for its incorrect capitalization as mandated by The Bluebook.  See, e.g., Dec. 29, 2004, Order at 5 n.1 ("In addition to capitalizing 'Court' when naming any court in full or when referring to the U.S. Supreme Court, practitioners should also capitalize 'Court' in a court document when referring to the court that will be receiving that document." The Bluebook: A Uniform System of Citation P. 6(a) at 17 (Columbia Law Review Ass'n et al. eds., 17th ed. 2000)"); id. at 11 ("Based on this conduct, the Court feels compelled to admonish the Government lawyers that continued verbal argument after a court rules is not in keeping with the decorum expected and required in a court of law.  Moreover, repeated written argument after a ruling has been made and a proper motion for reconsideration has been denied is truly a waste of judicial resources.").

the discovery orders[7] and sanctions imposed by Judge Gilmore.  We stayed proceedings in the trial court pending our review of the Government's petition.[8]

## Jurisdiction

The common-law writ of mandamus is codified at 28 U.S.C. § 1651(a).  A writ of mandamus is an extraordinary remedy.  "It is charily used and is not a substitute for appeal."  In re Chesson, 897 F.2d 156, 159 (5th Cir. 1990).  Mandamus is appropriate only "when the trial court has exceeded its jurisdiction or has declined to exercise it, or when the trial court has so clearly and indisputably abused its discretion as to compel prompt intervention by the appellate court."  In re Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir. 1992) (citing In re Chesson, 897 F.2d at 159).  Specifically, a court must find three requirements before a writ will issue:  (1) "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires"; (2) "the petitioner must satisfy the burden of showing that [his]

---

[7]     Specifically, the Government requests that the following discovery orders (all interrelated) be vacated: the discovery order entered October 29, 2004, requiring the United States to produce discovery evidence relating to the United States's capital charging practices; an oral order announced at the December 17, 2004, status conference, purporting to compel the United States to submit a signed letter from the United States Attorney General asserting that he will not comply with the discovery order because the requested information is privileged; and a December 29, 2004, written order detailing the sanctions the district court will impose for the United States's failure to comply with the discovery orders.

[8]     Although this court had granted a stay on December 31, 2004, Judge Gilmore entered yet another order denying the Government's motion for a stay of the proceedings on January 3, 2005.  In that order, she stated that any stay of the proceedings could make it "unlikely that this case could be rescheduled for trial before January 2006."  Amended Order, Jan. 3, 2005.

right to issuance of the writ is clear and indisputable"; and (3) "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." Cheney v. United States District Court for the District of Columbia, __ U.S. __, 124 S. Ct. 2576, 2587, 159 L.Ed.2d 459 (2004) (partially quoting Will v. United States, 389 U.S. 90, 95, 88 S. Ct. 269, 274, 19 L.Ed.2d 305 (1967) (alterations in original; internal citations and quotations omitted).

As the Supreme Court has recently noted, "[t]hese hurdles, however demanding, are not insuperable. [Federal courts] ha[ve] issued the writ to restrain a lower court when its actions would threaten the separation of powers by 'embarass[ing] the executive arm of the Government.'" Id. at __, 124 S. Ct. at 2587 (quoting Ex parte Peru, 318 U.S. 578, 588, 63 S. Ct. 793, 799, 87 L.Ed. 1014 (1943)). In fact, "[a]ccepted mandamus standards are broad enough to allow the court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities." Cheney, __ U.S. at __, 124 S. Ct. at 2587 (citing Clinton v. Jones, 520 U.S. 681, 701, 117 S. Ct. 1636, 1648, 137 L.Ed.2d 945 (1997)).

Relevant to this case, various courts of appeals have found mandamus appropriate in all three issues intertwined in this petition: jury instructions, discovery orders, and assertions of privilege. Both the Second and Third Circuits have permitted the

12

Government to obtain writs of mandamus when a proposed criminal jury instruction clearly violated the law, risked prejudicing the Government at trial with jeopardy attached, and provided the Government no other avenue of appeal.  See <u>United States v. Pabon-Cruz</u>, 391 F.3d 86, 91-92 (2d Cir. 2004); <u>United States v. Wexler</u>, 31 F.3d 117, 121 (3d Cir. 1994).  Further, this court, in accord with other circuits, has considered and issued writs of mandamus over discovery orders implicating privilege claims.  <u>See</u> <u>In re Avantel</u>, 343 F.3d 311, 317 (5th Cir. 2003); <u>accord</u> <u>In re Occidental Petroleum Corp.</u>, 217 F.3d 293, 295 (5th Cir.2000); <u>In re Spalding Sports Worldwide, Inc.</u>, 203 F.3d 800, 804 (Fed. Cir. 2000); <u>In re General Motors Corp.</u>, 153 F.3d 714, 715 (8th Cir. 1998); <u>Chase Manhattan Bank, N.A. v. Turner & Newall, PLC</u>, 964 F.2d 159, 163 (2d Cir. 1992); <u>Harper & Row Publishers, Inc. v. Decker</u>, 423 F.2d 487, 492 (7th Cir. 1970), <u>aff'd</u>, 400 U.S. 348, 91 S. Ct. 479, 27 L.Ed.2d 433 (1971) ("[B]ecause maintenance of the attorney-client privilege up to its proper limits has substantial importance to the administration of justice, and because an appeal after disclosure of the privileged communication is an inadequate remedy, the extraordinary remedy of mandamus is appropriate.").

## Discussion

As the petitioner, the Government must first show that it has no alternative means of relief.  In her final ruling on the discovery issue, Judge Gilmore could have dismissed the Death

13

Notice, as the Government requested, and her ruling would have been immediately appealable.  See 18 U.S.C. § 3731; Frye, 372 F.3d at 733-34.  Instead, Judge Gilmore styled her order a discovery "sanction" on the Government, which is ordinarily unavailable for interlocutory appeal.  If Williams were acquitted of the death penalty, double jeopardy would preclude the Government from appealing Judge Gilmore's unusual jury instruction.  Thus, the Government's only recourse was through a writ of mandamus.  Cf. Pabon-Cruz, 391 F.3d at 91 ("Challenges to a proposed jury charge may properly be considered on a petition for a writ of mandamus."); accord United States v. Wexler, 31 F.3d at 117.

Next, the Government must show that its right to issuance of the writ is "clear and indisputable."  Cheney, __ U.S. at __, 124 S. Ct. at 2587 (quotations omitted).  The Government asserts that Judge Gilmore clearly erred in two principal, related ways: (1) by incorrectly applying United States v. Armstrong, 517 U.S. 456, 117 S. Ct. 1480, 134 L.Ed.2d 687 (1996), and thus improperly ordering discovery against the United States; and (2) by styling a discovery "sanction" that contravenes the Federal Death Penalty Act and creates an unauthorized defense against the death penalty.  We agree as to both claims.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his

14

discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L.Ed.2d 604 (1978). The exercise of prosecutorial discretion is limited by the Equal Protection Clause, however. A court's consideration of an Equal Protection-based claim of selective prosecution necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors. See Armstrong, 517 U.S. at 465-66, 116 S. Ct. at 1486-87. To overcome this presumption, a defendant must prove both discriminatory effect and discriminatory purpose by presenting "clear evidence." Id. at 465, 116 S. Ct. at 1486 (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S. Ct. 1, 6, 71 L.Ed. 131 (1926)). Before a criminal defendant is entitled to any discovery on a claim of selective prosecution, he must make out a prima facie case. The prima facie case of selective prosecution requires the criminal defendant to bring forward some evidence that similarly situated individuals of a different race could have been prosecuted, but were not. Armstrong, 517 U.S. at 465, 116 S. Ct. at 1487; United States v. Webster, 162 F.3d 308, 333-34 (5th Cir. 1999). More specifically, a defendant must first present evidence of both discriminatory effect and discriminatory intent. Id.

In concluding that Williams had made a prima facie case of selective prosecution, Judge Gilmore ignored Supreme Court precedent and the plain facts as stated by the defendant himself. First, Williams's counsel admits in his Memorandum that he needs

15

discovery so "that he may make a prima facia [sic] case on the allegations" of selective prosecution. Williams thus concedes that he cannot make out a prima facie case, which is what he must do prior to receiving any discovery. See Armstrong, 517 U.S. at 468, 116 S. Ct. at 1488; Webster, 162 F.3d at 333-34.

Equally important, Williams's scant court filings acknowledge that the Government declined to pursue the death penalty against a similarly situated, black co-defendant.[9] To adopt the language of Williams's counsel, it is "clear to the naked eye" that Williams has not made the requisite showing under Armstrong to warrant discovery on a selective prosecution claim. As the Government continually argued to Judge Gilmore, only Williams and Holloway — both of whom are African-American — were in the truck at the time of the alleged events, making them the only "similarly situated" co-defendants. In stark contrast, no other co-defendants, although part of the conspiracy and ultimately responsible for the acts (if proven at trial), were on the scene during the lethal interval. Only Williams, the driver of the truck, was allegedly able to prevent the victims' deaths; for this reason, the Government is pursuing the death penalty against Williams alone. The Notice of Intent to Seek the Death Penalty emphasizes this distinction. Because Williams could not

_____

[9] By contrast, Williams now asserts that Holloway was not similarly situated because she cooperated with the Government. This does nothing to help his claim of selective prosecution.

16

demonstrate that similarly situated, non-African-American co-defendants were treated differently, he could not sustain his burden even as to this prong of Armstrong.[10]

Finally, the "study" submitted by Williams is exactly the type of evidence that warranted summary reversal of a court of appeals when used to justify discovery in a selective prosecution claim. See Bass, 536 U.S. at 862, 122 S. Ct. at 2389. Although Williams's "study" does involve defendants charged with alien smuggling, sharing a charge alone does not make defendants "similarly situated" for purposes of a selective prosecution claim.[11] A much stronger showing, and more deliberative analysis, is required before a district judge may permit open-ended discovery into a matter that goes to the core of a prosecutor's function and implicates serious separation of powers concerns. Judge Gilmore's misapplication of Armstrong represents clear legal error.

Nevertheless, under the second prong of mandamus review,

---

[10] Further, the indictment, coupled with the Government's rationale offered to Judge Gilmore after Williams raised a selective prosecution claim, offered a valid, non-discriminatory explanation for seeking the death penalty against Williams. Cf. Webster, 162 F.3d at 335 (finding a non-discriminatory explanation where the Government's determination to pursue the death penalty against one defendant and not others "is justified by the objective circumstances of the crime and the sufficiency and availability of evidence to prove the required elements under the law").

[11] See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S. Ct. 1064, 1073, 30 L.Ed. 220 (1886) (demonstrating that Government officials denied the applications of 200 Chinese nationals seeking to operate laundries in wooden buildings, but granted the applications of 80 non-Chinese individuals desiring to operate laundries in wooden buildings) (cited by Armstrong, 517 U.S. at 466, 116 S. Ct. at 1487, in explaining the extremely high, "but not impossible," standard a criminal defendant must meet to demonstrate the "similarly situated" requirement).

the writ should not issue unless Judge Gilmore's discovery orders and sanction also represented a clear abuse of discretion. See Cheney, __ U.S. at __, 124 S. Ct. at 2587.  This they did.

First, the court continually expanded the breadth of permissible discovery.  Initially, she permitted broad and vague discovery of the Government's "capital-charging practices."  See Order, Oct. 29, 2004.[12]  Next, after the Government provided significant, generalized information, Judge Gilmore ordered the Government to reveal its capital-charging practices "inclusive of this case but not this case exclusively."  See Status Conference, Nov. 1, 2004, Tr. at 17.  The Government repeatedly asserted work product, attorney-client, and deliberative process privileges against these orders.

In the ordinary case, a party must claim privilege with specificity, and a court can ultimately demand in camera review of privileged documents.  See, e.g., In re Grand Jury Proceedings, 55 F.3d 1012, 1015 (5th Cir. 1995).  In this extreme situation, however, the Government's assertion of privilege was sufficient.  Cf. Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 380 (2d Cir. 1973) (refusing to permit even in camera review of information relating to the exercise of prosecutorial

---

[12]    However, Judge Gilmore later conceded, as she was required by Armstrong, that this type of information was not subject to the requirements of Federal Criminal Rule of Procedure 16.  See Armstrong, 517 U.S. at 463, 116 S. Ct. at 1485 ("We hold that Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims."); accord Order, Dec. 29, 2004, at 15.

18

discretion).  The court's ever-changing and inspecific orders afforded no boundaries on discovery, and in effect compelled the Government to volunteer information (as opposed to responding to a request by Williams), contrary to Armstrong and to Federal Rule of Criminal Procedure 16.  See Armstrong, supra n.13.  Moreover, turning over any further information — even in camera — would require documents, affidavits, or perhaps even depositions from several levels of the Department of Justice, all of which could engender various privilege claims, and as a precedent, could be subject to abuse in this and in future cases.  Based on the minimal showing made by Williams, Judge Gilmore clearly abused her discretion in granting wide-ranging discovery.[13]

The nature of the "sanction" imposed by the trial court is also relevant to whether the trial court abused its discretion. A severely disproportionate penalty may well indicate whether the court objectively considered protection of the Government's prosecutorial privilege or reacted emotionally to a superficially questionable indictment.  Racially selective prosecution is a challenge to the prosecution, not a defense to the crime charged. Accordingly, the Federal Death Penalty Act affords no mitigation of penalty based on selective prosecution.[14]  See generally 18 U.S.C.

---

[13]  We state no opinion on the appropriate parameters required when and if a criminal defendant makes a showing sufficient under Armstrong to obtain discovery.

[14]  Further, the premise of Judge Gilmore's proposed instruction is false.  The proposed instruction states that the order the Government declined to follow was "lawful"; as our previous analysis has discussed, this was not the

19

§ 3592. The court's "sanction" instruction would, however, place the burden on the Government to prove that it had not engaged in discriminatory selective prosecution of Williams; this would turn on its head the <u>Armstrong</u> requirement that the <u>defendant</u> carry the high burden of proof of selective prosecution. See <u>Armstrong</u>, 517 U.S. at 465-66, 116 S. Ct. at 1486-87. In this way, the instruction would create an extra-statutory, wholly unauthorized defense of selective prosecution. <u>See</u> 18 U.S.C. § 3592(a)(1)-(8) (delineating permissible mitigating factors a defendant may raise). Judge Gilmore's jury instruction appears simultaneously to be preventing the Government from enforcing the death penalty against Williams, while prohibiting any ordinary appellate review of the court's determination.[15] This combination of legislating from the bench and acting as a quasi-defense attorney vis-à-vis the jury is unprecedented and ultra vires.[16]

---

case.

[15] Although Williams is correct in asserting that "capitally charged defendants must be permitted to present <u>all</u> relevant mitigating evidence" (Br. in Opp. to Petition at 41), the defendant is not entitled to have the district judge make such arguments for him from the bench under the guise of a "jury instruction."

[16] We will not devote much effort to Judge Gilmore's demand that the Attorney General of the United States himself sign a letter asserting privilege. This request was obviously inappropriate. <u>See</u> 28 U.S.C. § 541 (President of the United States appoints each United States Attorney); 28 U.S.C. § 547 (defining the powers of the United States Attorneys); 28 U.S.C. §§ 516-520 (vesting plenary power in the Attorney General of the United States to supervise and conduct all litigation to which the United States is a party); 28 U.S.C. §§ 542, 547 (allowing delegation of responsibilities from the Attorney General and the United States Attorney to Assistant United States Attorneys); <u>see also</u> <u>In re Office of Inspector General</u>, 933 F.2d 276, 278 (5th Cir. 1991) ("[T]op executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.") (quoting <u>Simplex Time Recorder Co. v. Secretary of Labor</u>, 766 F.2d 575, 586 (D.C. Cir. 1985)).

Based on the Government's extraordinary showing under the first two parts of the mandamus test, we conclude that issuance of the writ, though discretionary, is appropriate under the circumstances. Cheney, __ U.S. at __, 124 S. Ct. at 2587. While we are loath to interfere with the manner in which a district court runs its cases, mandamus is demanded in this death penalty case where over two hundred venirepersons are poised to be impanelled, where the consequence of the court's instructional error could deprive society of a lawful punishment, and where the trial court has disregarded controlling law and in a gross abuse of discretion, prejudiced the Government's case and stymied orderly appellate review. We grant the Government's writ of mandamus and vacate both the discovery orders[17] and the sanctions.

## Conclusion

On remand, we expect the case to proceed as expeditiously as possible[18] while advancing the legitimate goals of the federal judicial system and protecting the rights of both parties. The writ of mandamus is **GRANTED**, and the discovery orders and sanction are **VACATED**. **IT IS FURTHER ORDERED** that the stay of trial

---

[17] Judge Gilmore appeared to reconsider her demand that the Attorney General of the United States respond to her requests in writing in her December 29, 2004, Order. See Order, Dec. 29, 2004, at 14-15. However, because she never formally vacated that order, the writ of mandamus should be read to vacate that discovery order to the extent it still exists.

[18] This includes using the current jury pool, each member of which has obeyed his civic duty and gone through the laborious process of completing the questionnaires submitted by counsel. If trial is not commenced within thirty days, the Government may seek further mandamus relief to that end.

proceedings is hereby **LIFTED** and the case is **REMANDED** for **IMMEDIATE**

proceedings not inconsistent with this opinion.