The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 18, 2024

## 2024COA7

**No. 21CA1676, *People v. Mitchell* — Constitutional Law — Fourteenth Amendment — Equal Protection — Selective Prosecution**

A division of the court of appeals considers whether codefendants charged with the same offense are necessarily similarly situated for purposes of a selective prosecution claim. Informed by how federal courts have addressed selective prosecution claims, the division concludes that sharing a charge does not, by itself, make codefendants similarly situated. Rather, the People may make different prosecutorial decisions with respect to codefendants who share a charge based on their different conduct.

The division next addresses whether the district court erred by denying the defendant's motion for a reverse transfer to juvenile

court or by excluding certain evidence. The division concludes that the district court did not err and, accordingly, affirms the judgment.

Court of Appeals No. 21CA1676
Arapahoe County District Court No. 19CR1443
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Demarea Deshawn Mitchell,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Freyre and Richman*, JJ., concur

Announced January 18, 2023

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2023.

¶ 1    Demarea Deshawn Mitchell and three codefendants, all juveniles, conspired to rob the victim at gunpoint.  During the attempted robbery, the victim was shot and killed.  The People initially charged the four youths with felony murder based on their participation in the attempted robbery, prosecuting all four as adults.  But after two of the codefendants, neither of whom is Black, agreed to cooperate with law enforcement, the People refiled their cases into juvenile court.

¶ 2    Mitchell, who is Black, argues that, by continuing to prosecute him as an adult while treating the two non-Black codefendants as juveniles, the People engaged in selective prosecution based on race.  He argues that the four codefendants were similarly situated at the outset of the case because the People filed the same charges against all of them.  But, informed by how federal courts have addressed selective prosecution claims, we conclude that sharing a charge does not, by itself, make codefendants similarly situated for purposes of a selective prosecution claim.  Rather, the People may make different prosecutorial decisions with respect to codefendants who share a charge based on their different conduct.

¶ 3     We further conclude that the district court did not err by denying Mitchell's motion for a reverse transfer to juvenile court or by excluding certain evidence. We therefore affirm the judgment of conviction entered on jury verdicts finding Mitchell guilty of first degree felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery.

## I.     Background

¶ 4     The following evidence was presented at trial. In the spring of 2019, when high school students K.G. and J.S. were dating, K.G. came up with the idea of robbing the victim, another student, for vaping products. The victim was best friends with J.S.'s ex-boyfriend, and K.G. did not like him for that reason. J.S. agreed to the plan and arranged to meet up with the victim, ostensibly to buy the vaping products from him.

¶ 5     On May 8, 2019, K.G. called his friend D.S., told him about the planned robbery, and asked to borrow a stolen gun D.S. had in his possession. D.S. agreed to the plan, and when K.G. picked him up in J.S.'s car, D.S. brought the loaded gun. The two then called Mitchell and asked "if he wanted to hang out for a little." Mitchell agreed to hang out, and they picked him up as well. K.G. told

2

Mitchell about the plan to rob the victim, and Mitchell agreed to the plan.

¶ 6    K.G., D.S., and Mitchell discussed how they would conduct the robbery. They decided that, when they met up with the victim as J.S. had arranged, "they were going to roll down the window [of the car] and just drive away with [the vaping products]; but if that didn't, like, work, then they had the gun to, like, pop out."

¶ 7    K.G., D.S., and Mitchell picked up J.S. from work that evening, and the four of them drove to the victim's house. K.G. was driving, J.S. was in the front passenger seat, and D.S. and Mitchell were in the back with the gun either on the seat between them or on the floor. When they arrived at the victim's house, the four again discussed the planned robbery and agreed that, if they "couldn't just take the stuff and drive off," then "somebody was going to get out the gun and scare" the victim.

¶ 8    J.S. texted the victim that she was there. The victim came outside, walked up to the car, spoke to J.S. through the window, and asked to see the money before showing her the vaping products. Mitchell picked up the gun, and he and K.G. got out of the car. Mitchell walked up to the victim, "grabbed him[,] and put

3

the gun to him." The victim resisted and wrestled Mitchell to the ground. K.G. ran toward them. Then, as they struggled, Mitchell shot the victim in the chest.

¶ 9    The victim screamed and ran back into his house. K.G. and Mitchell got back into the car, and the four of them drove away. K.G. asked Mitchell where he shot the victim, and Mitchell replied, "I don't know, somewhere in the stomach." They talked about what to do with the gun, and Mitchell offered to dispose of it. The next day, Mitchell attempted to sell it to another person.

¶ 10    In the hospital before he died, the victim told a police officer that "Kenny" (that is, K.G.) shot him.

## II.    Procedural History

¶ 11    Although K.G., J.S., D.S., and Mitchell were all juveniles at the time of the shooting, the People charged all four as adults with first degree felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. But several months later, the People refiled J.S.'s and D.S.'s cases into juvenile court, where — in exchange for "full proffers in cooperation with law enforcement" — J.S. and D.S. each pleaded guilty to one count of aggravated robbery and were subsequently sentenced to two years

in the custody of the Division of Youth Services (DYS). Nothing in the record indicates that a similar plea offer was extended to K.G. or Mitchell.

¶ 12    J.S. is Hispanic, D.S. is white, and K.G. and Mitchell are both Black.

¶ 13    Mitchell moved to "reverse transfer" his case to juvenile court under section 19-2.5-801(4), C.R.S. 2023. After a hearing, the district court denied the motion.

¶ 14    Mitchell then filed a motion to dismiss for selective prosecution and a request for discovery, arguing that the disparate treatment between himself and the two non-Black defendants, J.S. and D.S., rose "to the level of a selective prosecution based on race." He argued that "Black people are disproportionately represented and experience disparate treatment" in the American criminal justice system generally and the Eighteenth Judicial District of Colorado specifically, and that the People's decision to prosecute him as an adult while refiling J.S.'s and D.S.'s cases into juvenile court exemplified this unequal treatment. He noted, however, that no state agency currently publishes the statistical information he would need to determine whether Black youths are

disproportionately "direct filed" — that is, prosecuted as adults — in the Eighteenth Judicial District. Accordingly, he asked the court to order discovery of (1) all emails regarding plea negotiations between the prosecution and the lawyers for J.S. and D.S.; (2) any statistical data regarding charging decisions for direct-file-eligible juveniles; (3) any notes from meetings or staffing decisions in direct-file-eligible cases, including his own; (4) a list of all cases in which juveniles were direct file eligible and the race of those juveniles; and (5) the outcome of each case in which juveniles were direct file eligible.

¶ 15 The court denied the motion. Mitchell proceeded to trial, and the jury found him guilty as charged. The court imposed the mandatory sentence for felony murder of life in the custody of the Department of Corrections (DOC) with the possibility of parole after forty years.

¶ 16 Mitchell now appeals.

### III. Analysis

¶ 17 Mitchell contends that the district court erred by (1) denying his motion to dismiss for selective prosecution and request for discovery; (2) denying his motion for a reverse transfer to juvenile

6

court; and (3) excluding certain evidence at trial.  We address each contention in turn.

## A.  Selective Prosecution

¶ 18    Mitchell contends that the district court erred by finding that he failed to make the threshold showing of selective prosecution necessary to obtain discovery.  We disagree.

### 1.  Standard of Review and Governing Law

¶ 19    We review the district court's denial of discovery on a selective prosecution claim for an abuse of discretion.  *See People v. Butler*, 224 P.3d 380, 384 (Colo. App. 2009).  A court abuses its discretion "if it misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result."  *People v. Johnson*, 2019 COA 159, ¶ 10, *aff'd*, 2021 CO 35.

¶ 20    The decision to prosecute is within the exclusive province of the district attorney.  Colo. Const. art. VI, § 13.  A prosecutor has "wide discretion in determining who to prosecute for criminal activity and on what charge."  *Butler*, 224 P.3d at 383 (quoting *People v. Kurz*, 847 P.2d 194, 196 (Colo. App. 1992)).  But a prosecutor's discretion to bring charges is constrained by the Equal Protection Clause of the Fourteenth Amendment.  *United States v.*

*Armstrong*, 517 U.S. 456, 464 (1996); *People v. Gallegos*, 226 P.3d 1112, 1118 (Colo. App. 2009). "Equal protection of the laws guarantees that persons who are similarly situated will receive like treatment by the law." *Harris v. Ark*, 810 P.2d 226, 229 (Colo. 1991).

¶ 21 "Selective prosecution is a claim that the prosecutor has brought a criminal charge for a forbidden reason, such as race or religion, that violates equal protection." *Butler*, 224 P.3d at 384 n.1. The defendant has the burden of establishing that "the selective prosecution had a discriminatory effect and was motivated by a discriminatory purpose." *Kurz*, 847 P.2d at 197. To obtain discovery on a selective prosecution claim, the defendant must provide some credible evidence tending to show the existence of both discriminatory effect and discriminatory intent. *People v. Valencia-Alvarez*, 101 P.3d 1112, 1116 (Colo. App. 2004); *see also Butler*, 224 P.3d at 384. "The *some credible evidence* standard for obtaining discovery on a claim of selective . . . prosecution is 'rigorous.'" *Butler*, 224 P.3d at 384 (quoting *Armstrong*, 517 U.S. at 468).

8

¶ 22    "To establish a discriminatory effect [on the basis of race], the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465.  "The threshold question in any equal protection challenge is whether the persons allegedly subject to disparate treatment are in fact similarly situated." *People v. Black*, 915 P.2d 1257, 1260 (Colo. 1996). "[S]haring a charge alone does not make defendants 'similarly situated' for purposes of a selective prosecution claim." *In re United States*, 397 F.3d 274, 285 (5th Cir. 2005).  Rather, "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir. 2005) (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)).

¶ 23    "The fact that some people escaped prosecution under a statute is not a denial of equal protection unless the prosecutor's selective enforcement of the statute was intentional or purposeful." *People in Interest of T.B.*, 2016 COA 151M, ¶ 67, *aff'd*, 2019 CO 53. Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences.  It implies that the

9

decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)).  Discriminatory purpose can be shown by either direct or circumstantial evidence.  *Deberry*, 430 F.3d at 1299. Generally, to prevail under the Equal Protection Clause, a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose."  *McCleskey*, 481 U.S. at 292.  But in "certain limited contexts," courts have "accepted statistics as proof of intent to discriminate."  *Id.* at 293.  In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), for example, where all but one of the white applicants received permits to operate laundries but none of the Chinese applicants did, the "statistical pattern of discriminatory impact demonstrated a constitutional violation."  *McCleskey*, 481 U.S. at 293 n.12.

### 2.    Discussion

¶ 24    Mitchell argues that the four juvenile codefendants were "similarly situated at the outset of the case" because all were charged with felony murder based on their equal participation in

10

the attempted robbery. Relying on the felony murder statute, Mitchell suggests that it does not matter who shot the victim because liability arises from the participation in, and the intent to commit, the predicate felony — attempted robbery.

¶ 25 But the district court found that, regardless of the charges filed, Mitchell was not similarly situated to J.S. and D.S. because the evidence "support[ed] a finding that Mr. Mitchell is the participant who actually shot and killed" the victim. Although the court found that "[c]onsideration of that fact alone is sufficient to find that [Mitchell] is not similarly situated to the [other] individuals who drove to the scene," it further noted that Mitchell was not similarly situated to J.S. and D.S. because the latter two chose to cooperate with law enforcement and "participated in proffers with the district attorney which included acknowledgment of their respective roles in the crime." Accordingly, the court found that Mitchell "ha[d] not met his burden to show a discriminatory effect in the continued prosecution of him as an adult."

¶ 26 The district court properly went beyond the charges the four juveniles shared and considered each participant's involvement in the crime to determine whether they were similarly situated. Apart

from the victim's statement that "Kenny" (that is, K.G.) shot him, the bulk of the evidence supported a finding that Mitchell fired the shot that killed the victim. Further, the evidence suggested the victim may have named K.G. because he knew and could identify him, while he did not know Mitchell. Under these facts, the evidence that Mitchell was the likely shooter was a "legitimate prosecutorial factor[]" on which the prosecution could permissibly base its decision to treat Mitchell differently than J.S. and D.S. *Deberry*, 430 F.3d at 1301 (quoting *Olvis*, 97 F.3d at 744); *see, e.g.*, *Keene v. Mitchell*, 525 F.3d 461, 465 (6th Cir. 2008) (concluding that the defendant, who "was the triggerman in four out of the five aggravated murders," was not similarly situated to a codefendant who "was not the triggerman for any of the murders"); *In re United States*, 397 F.3d at 284 (concluding that the driver of a truck in which nineteen migrants died was not similarly situated to other participants in the smuggling conspiracy because only he, as the driver, could have heeded the victims' screams, stopped the truck, and prevented their deaths); *United States v. Cook*, 949 F.2d 289, 291-92 (10th Cir. 1991) (concluding that the defendant — a "'major,' 'high ranking' cocaine trafficker" — was not similarly

12

situated to a codefendant whose "participation was limited to throwing the cocaine out the car window when [the defendant] handed it to her and ordered her to do so").

¶ 27 Further, as the district court noted, the decision by J.S. and D.S. to cooperate with law enforcement was another legitimate factor for prosecutorial decision-making. In the district court proceeding, the People asserted, and Mitchell did not dispute, that "both co-conspirators who resolved their cases via plea bargains offered full proffers in cooperation with law enforcement in advance of *any* plea bargain being offered." *See, e.g.*, *United States v. Darif*, 446 F.3d 701, 708 (7th Cir. 2006) (concluding that the defendant was not similarly situated to codefendants who "agreed to accept immunity in exchange for testimony against" him); *United States v. Alanis*, 265 F.3d 576, 585 (7th Cir. 2001) (noting that "it is axiomatic that an individual who decides not to cooperate with the government is not similarly situated to one who does cooperate," but acknowledging that, if the "bigger picture showed that in all similar cases the non-Mexican suspects were given an opportunity to cooperate to the exclusion of those of Mexican descent, obviously the issue might well be different").

¶ 28    We thus conclude that the district court did not abuse its discretion by finding that Mitchell was not similarly situated to J.S. and D.S. and that he therefore had not demonstrated discriminatory effect.

¶ 29    To obtain discovery on a selective prosecution claim, a defendant must provide some credible evidence of both discriminatory effect and discriminatory purpose.  *Valencia-Alvarez*, 101 P.3d at 1116; *Armstrong*, 517 U.S. at 468.  Because Mitchell has not demonstrated discriminatory effect, we do not address whether his statistical evidence meets the *some credible evidence* threshold for demonstrating discriminatory purpose.

## B.    Reverse-Transfer Hearing

¶ 30    Mitchell contends that the district court erred by denying his motion for a reverse transfer to juvenile court because it misapplied two of the statutory factors it was required to consider: "the maturity of the juvenile" and "[t]he likelihood of the juvenile's rehabilitation."  § 19-2.5-801(4)(b)(IV), (VII).  We disagree.

### 1.    Standard of Review and Governing Law

¶ 31    We review issues of statutory interpretation and application de novo.  *People v. Johnson*, 2016 CO 69, ¶ 9; *People v. Barnett*, 2020

COA 167, ¶ 10.  In doing so, "we give words and phrases their plain and ordinary meaning, read them in context, and construe them according to the rules of grammar and common usage." *People v. Brown*, 2019 CO 50, ¶ 16.  But we review the district court's factual findings for clear error and defer to those findings if they are supported by the record.  *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo. 1994).

¶ 32    A juvenile charged by direct filing in district court may move for a reverse transfer to juvenile court.  § 19-2.5-801(4)(a); *Johnson*, ¶ 10.  Upon receipt of the motion, the court must set a reverse-transfer hearing with the preliminary hearing. § 19-2.5-801(4)(a).  "In determining whether the juvenile and the community would be better served by" the case proceeding in the adult criminal system or the juvenile system, the court "shall consider" eleven factors:

> (I) The seriousness of the alleged offense and whether the protection of the community requires response or consequence beyond that afforded by [the juvenile system];
>
> (II) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

15

(III) Whether the alleged offense was against persons or property, greater weight being given to offenses against persons;

(IV) The age of the juvenile and the maturity of the juvenile, as determined by considerations of the juvenile's home, environment, emotional attitude, and pattern of living;

(V) The juvenile's record and previous history in prior court-related matters;

(VI) The juvenile's current and past mental health status, as evidenced by relevant mental health or psychological assessments or screenings that are made available to both the district attorney and defense counsel;

(VII) The likelihood of the juvenile's rehabilitation by use of the sentencing options available in the juvenile courts and district courts;

(VIII) The interest of the community in the imposition of a punishment commensurate with the gravity of the offense;

(IX) The impact of the offense on the victim;

(X) Whether the juvenile was previously committed to the department of human services following an adjudication for a delinquent act that constitutes a felony; and

(XI) Whether the juvenile used, or possessed and threatened the use of, a deadly weapon in the commission of the delinquent act.

§ 19-2.5-801(4)(b).

## 2. Maturity

¶ 33 At the reverse-transfer hearing, the defense presented an expert in adolescent psychology who testified that, during her work with Mitchell, she administered an assessment called the Risk-Sophistication-Treatment Inventory (RSTI).  She testified that "the RSTI was developed in an attempt to provide courts with information . . . about dangerousness, sophistication, and . . . treatment amenability, as it relates to juveniles who are . . . involved in the juvenile justice system."  She further testified that Mitchell's "scores were in . . . the high range for sophistication and maturity."

¶ 34 In its oral ruling on Mitchell's reverse-transfer motion, the district court discussed all eleven statutory factors and the evidence relevant to each.  As to the fourth factor, "[t]he age of the juvenile and the maturity of the juvenile, as determined by considerations of the juvenile's home, environment, emotional attitude, and pattern of living," § 19-2.5-801(4)(b)(IV), the court made the following findings:

- Mitchell was one month shy of his seventeenth birthday at the time of the offense;

- Mitchell experienced trauma during his childhood, including domestic violence, child abuse, homelessness, multiple changes of school, and the violent loss of several men close to him;

- the juvenile brain is not fully developed, particularly with regard to the high-level executive functioning involved in decision-making, reasoning, impulse control, and empathy;

- Mitchell "scored high in maturity and sophistication during his . . . testing and evaluation" by the adolescent psychology expert;

- youth services center staff "viewed [Mitchell] as a leader, someone who could be counted on to help control other juveniles at the center, someone who could lead by example"; and

- Mitchell's RSTI evaluation scores and leadership at the youth services center suggested that he was amenable to change and treatment, but also "suggest[ed] that [he] possessed both maturity and sophistication at the time of the offense and was not merely the victim of an adolescent brain" or "peer pressure."

¶ 35    Mitchell acknowledges that "the RSTI maturity score was relevant evidence" that the district court could properly consider in ruling on his motion for reverse transfer, but he argues that the court reversibly erred by allowing the RSTI to "outweigh[]" the evidence regarding the environment in which he grew up.  The reverse-transfer statute, however, provides only that the court "shall consider" the eleven factors.  It is left for the court to determine how to weigh the evidence presented regarding each factor.  Further, there is no indication in the record that the court viewed the RSTI as "outweigh[ing]" other relevant evidence.  Rather, the court found that Mitchell's high scores in maturity and sophistication, combined with his demonstrated leadership at the youth services center, suggested both an amenability to change and treatment *and* a greater degree of responsibility for his actions at the time of the offense.

¶ 36    These findings are grounded in the evidence.  We thus discern no error in the court's application of the fourth factor.

### 3.    Likelihood of Rehabilitation

¶ 37    The adolescent psychology expert testified that Mitchell was at a "crossroads" where he "could go one way or the other" — that is,

he had "the potential to get some treatment and address his mental health concerns and learn some skills to live a prosocial life," but he could also "go the other way and . . . become a more sophisticated criminal." She testified that Mitchell's treatment needs were "pretty high" and that "complex trauma and the level of mental health symptoms that he has are difficult to treat and can take a lot of time to treat." She testified that there was "substantial room for rehabilitation . . . with the right services," but that a "lifetime of trauma" could not be dealt with "overnight."

¶ 38    The assessment services coordinator for DYS testified about the "treatment modalities . . . DYS use[s] in its facilities." The coordinator also testified that the recidivism rate (defined as commission of class 1 misdemeanors and felonies) among juvenile offenders coming out of DYS programs was "approximately 55 percent" over a three-year period.

¶ 39    As to the seventh statutory factor, "[t]he likelihood of the juvenile's rehabilitation by use of the sentencing options available in the juvenile courts and district courts," § 19-2.5-801(4)(b)(VII), the district court made the following findings:

- the adolescent psychology expert expressed "concerns about [Mitchell] going to [DOC] and being surrounded by negative influences";

- Mitchell's treatment needs were "high" and could "take a long time" to address;

- DYS "likely provides greater services [than DOC] to people in its programs, but it has very little time in which to provide those services given that it loses jurisdiction over its clients at the age of 21";

- the court was "discouraged and disappointed in the recidivism rate of 55 percent with [DYS]"; and

- in light of all of the evidence, the court had "insufficient confidence in the ability of the sentencing options available in the juvenile courts to ensure [Mitchell's] rehabilitation."

¶ 40    Mitchell argues that the court reversibly erred by "requir[ing] . . . a demonstration that the DYS options would 'ensure' [his] rehabilitation." He argues that the seventh statutory factor does not require that the sentencing options available in juvenile court "ensure" a juvenile's rehabilitation, and that the

21

court's misinterpretation of the statute "impos[ed] an insurmountable burden."

¶ 41     We agree with Mitchell that the statute does not require the court to find that a juvenile's rehabilitation is "ensured" before transferring the case to juvenile court — rather, it requires the court only to consider "[t]he likelihood of the juvenile's rehabilitation." § 19-2.5-801(4)(b)(VII).  But the record shows that the district court properly considered the likelihood of Mitchell's rehabilitation by use of the sentencing options available in the juvenile courts and district courts.  The court considered the adolescent psychology expert's concerns about the negative influences Mitchell would encounter in DOC, the treatment opportunities available through DYS, the evidence that Mitchell had significant treatment needs, and the recidivism evidence.  In short, the district court undertook the analysis required by the seventh statutory factor, despite its ill-chosen use of the word "ensure."

¶ 42     Further, section 19-2.5-801(4)(b) directs the court to consider the likelihood of rehabilitation as one of eleven factors in determining whether to order a reverse transfer to juvenile court. The statute leaves the determination of how to weigh the factors to

the court's discretion. Thus, a court could properly determine that, where the alleged offense was serious (first factor), violent (second factor), committed against a person (third factor), the cause of the victim's death (ninth factor), and committed with a deadly weapon (eleventh factor), the juvenile and the community would be better served by the case proceeding in the juvenile system only if the likelihood of rehabilitation were very high.

¶ 43    We thus discern no error in the court's application of the seventh factor.

## C.    Evidentiary Ruling

¶ 44    Finally, Mitchell contends that the district court erred by excluding evidence that K.G. had previously robbed the victim. We disagree.

### 1.    Standard of Review

¶ 45    A district court has substantial discretion in ruling on the admissibility of evidence. *People v. Beilke*, 232 P.3d 146, 149 (Colo. App. 2009). We will not disturb the court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair. *Id.*

## 2.    Additional Background

¶ 46    The defense sought to present evidence at trial that K.G. had previously robbed or attempted to rob the victim for either vaping products or shoes.  Defense counsel argued that the evidence (1) was "consistent with [the] theory of defense that Mr. Mitchell was a late-joiner to this group, not part of the plan, and that [K.G.] had in fact done this before"; and (2) went to "lack of mistake by [the victim] in identifying [K.G.] as the shooter because this ha[d] happened previously."  The prosecutor objected, arguing that the evidence was irrelevant because an alleged prior instance of violence by K.G. against the victim had "nothing to do with whether or not [Mitchell] played a part in the second instance of violence."  The prosecutor also argued that, to the extent the defense was claiming that "because [K.G.] perpetrated some violence on [the victim] before, he must have been the sole perpetrator of violence here," this constituted improper character evidence under CRE 404(b).

¶ 47    The district court initially sustained the objection, but then it asked what evidence the defense had regarding a prior robbery, so that it could conduct a full analysis pursuant to *People v. Spoto,*

795 P.2d 1314 (Colo. 1990). Defense counsel responded that J.S. had told the police "that the reason that they did this is because [K.G.] had done this previously." The court and defense counsel then questioned J.S. outside the presence of the jury. J.S. said she was aware of a prior robbery but did not know whether K.G. had been involved in it or not. Based on J.S.'s responses, the court found that it could not determine by a preponderance of the evidence that any prior robbery of the victim by K.G. had occurred. Accordingly, the court did not permit the defense to inquire further into the issue.

### 3. Law and Discussion

¶ 48 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Only relevant evidence is admissible. CRE 402.

¶ 49 We agree with the People that evidence of a prior robbery by K.G. against the victim was not relevant. *See People v. Eppens*, 979 P.2d 14, 22 (Colo. 1999) (we may affirm the district court's ruling on any ground supported by the record). Because it was

25

uncontested that K.G. and the victim knew each other, evidence of a prior robbery did not make it more likely that the victim accurately identified "Kenny" as the shooter.[1]  Likewise, evidence that K.G. had previously robbed the victim did not make it less likely that Mitchell participated in the plan to rob the victim on May 8, 2019.  *See United States v. Farrington*, 58 F. App'x 919, 925 (3d Cir. 2003) (concluding that evidence that a codefendant "committed other frauds without [the defendant's] help does not render it less likely that he received [the defendant's] cooperation here").

¶ 50　Further, even assuming that evidence of the prior robbery could be considered relevant, the court's exclusion of the evidence because the defense failed to make the threshold showing under CRE 404(b) did not constitute an abuse of discretion.  Under CRE 404(b)(2), evidence of other acts may be admissible for a non-propensity purpose.  The district court is tasked with analyzing the

---

[1] As the People acknowledge, the prior robbery could have been relevant if there were evidence that the victim learned K.G.'s name and recognized him *because* of it.  But the defense proffered no such evidence, and the testimony indicated that the victim otherwise knew K.G.

evidence before it may be admitted, including a determination by a preponderance of the evidence that the other act occurred and that the person alleged committed it. *See People v. Garner*, 806 P.2d 366, 372 (Colo. 1991). Here, although the court and defense counsel questioned J.S. regarding the alleged prior robbery, J.S. disavowed any knowledge of K.G.'s involvement. The record thus supports the court's finding that it could not determine by a preponderance of the evidence that K.G. had previously robbed the victim.

¶ 51    We thus discern no abuse of discretion.

### IV.    Disposition

¶ 52    The judgment is affirmed.

JUDGE FREYRE and JUDGE RICHMAN concur.