1 

2026 CO 8
 Demarea Deshawn Mitchell, Petitioner: v. The People of the State of Colorado. Respondent: 
No. 24SC122
Supreme Court of Colorado, En Banc
February 2, 2026
 ADVANCE SHEET HEADNOTE 
 In this case, the supreme court granted certiorari to consider whether the court of appeals division below erred in affirming the trial court's denial of the defendant's motion to dismiss for selective prosecution in a case in which the defendant, who is Black, and his three codefendants were all charged with felony murder, but only the two non-Black defendants received a plea bargain offer that allowed them to be tried in juvenile court in exchange for their cooperation with law enforcement. 
 The court now concludes that the defendant did not establish that he was entitled to dismissal based on a claim of selective prosecution because he did not establish the requisite discriminatory effect or discriminatory purpose by the People. Specifically, he was not similarly situated to his non-Black codefendants because, unlike them, he was the one who confronted, shot, and killed the victim. 
 
2

 Nor did the statistical evidence that he provided establish grounds for dismissal based on a claim of selective prosecution. 
 Accordingly, the court affirms the division's judgment. 
 Certiorari to the Colorado Court of Appeals Court of Appeals Case No. 21CA1676 
 Attorneys for Petitioner: Henson Law, LLC Patrick R. Henson Denver, Colorado 
 Attorneys for Respondent: Philip J. Weiser, Attorney General Brenna A. Brackett, Assistant Attorney General Denver, Colorado 
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined. 
 
3

 OPINION 
 GABRIEL, JUSTICE 
 
4

 ¶1 We granted certiorari to consider whether the court of appeals division below erred in affirming the trial court's denial of Demarea Deshawn Mitchell's motion to dismiss for selective prosecution in a case in which Mitchell, who is Black, and his three codefendants were all charged with felony murder, but only the two non-Black defendants received a plea bargain offer that allowed them to be tried in juvenile court in exchange for their cooperation with law enforcement. 
 ¶2 We now conclude that Mitchell did not establish that he was entitled to dismissal based on a claim of selective prosecution because he did not establish the requisite discriminatory effect or discriminatory purpose by the People. Specifically, he was not similarly situated to his non-Black codefendants because, unlike them, he was the one who confronted, shot, and killed the victim. Nor did the statistical evidence that he provided establish grounds for dismissal based on a claim of selective prosecution. 
 ¶3 Accordingly, we affirm the judgment of the division below. 
 I. Facts and Procedural History 
 ¶4 The evidence developed by law enforcement prior to trial in this case tended to establish the following facts: 
 ¶5 In the spring of 2019, Mitchell and his three codefendants, Kenneth Gallegos, J.S., and D.S., all of whom were then juveniles, conspired to rob the 
 
5

 victim of vaping products. During the incident, Mitchell shot the victim in the chest, ultimately causing his death. 
 ¶6 J.S., a Hispanic female, initially planned the robbery with Gallegos, a Black male, whom she was dating at the time. Gallegos apparently disliked the victim because the victim was best friends with J.S.'s ex-boyfriend. 
 ¶7 On the day of the planned robbery, Gallegos called D.S. to see if he could borrow a gun that D.S. had in his possession. Gallegos told D.S. that he needed the gun because he was intending to rob the victim of some vaping products. Gallegos then picked D.S. up in J.S.'s car. D.S. brought the loaded gun with him. 
 ¶8 Later that afternoon, Gallegos and D.S. called Mitchell to see if he wanted to hang out for a while. He said that he did, and Gallegos and D.S. picked him up. While the three of them were hanging out, Gallegos told Mitchell about the plan to rob the victim, and Mitchell said that "he was down for it." The three then discussed the plan, which was "to roll down the window and just drive away with [the vaping products]; but if that didn't . . . work, then they had the gun to . . . pop out" and scare the victim. 
 ¶9 After J.S. finished working that day, Mitchell, Gallegos, and D.S. picked her up. The group then drove to the victim's house to carry out their plan. At this point, Gallegos was driving, J.S. sat in the front passenger's seat, and D.S. and Mitchell sat in the rear seats. 
 
6

 ¶10 When the group arrived at the victim's home, J.S. texted him to let him know that she was there. The victim came out and walked to where J.S. was seated in the car. J.S. handed the victim some money, and Mitchell apparently got out of the car with the gun. The victim then started to walk back to the house, but Mitchell, who was holding the gun, confronted him. A struggle ensued, and the victim threw Mitchell to the grass. During the ongoing struggle, Mitchell shot the victim. The victim screamed and ran into his house, and Mitchell and the three others fled. 
 ¶11 A neighbor called the police to report shots fired, and the police responded to the scene. There, the police found the victim unconscious and bleeding just inside the doorway of his home with his grandmother and sister around him. The victim was transported to a hospital where he regained consciousness for a time. While in the emergency room, he was asked who shot him, and he twice said, "Kenny" (i.e., Gallegos). He was further asked what school Kenny attended, and he responded, "Cherokee Trail." Finally, he was asked whether Kenny was a senior. The victim shook his head and said, "He's a junior." The victim was then taken into surgery, but he did not survive. 
 ¶12 Notwithstanding the victim's assertion that "Kenny" had shot him, law enforcement officers developed substantial evidence indicating that Mitchell, not Gallegos, was the one who had shot the victim, as described above. Among other 
 
7

 things, J.S. and D.S. both spoke with the police and directly implicated Mitchell as the sole triggerman. In addition, Mitchell had sent his girlfriend a Snapchat message that said, "I did some stuff," with an attachment to a news article about the shooting. He then sent another message that said, "Shit didn't go as planned." And it appears that Mitchell was the one who ultimately disposed of the gun. 
 ¶13 In light of the foregoing events, the People direct filed charges against all four juveniles in district court. The charges against the four were for felony murder, aggravated robbery, and conspiracy to commit aggravated robbery. The People, however, subsequently refiled only the charges of aggravated robbery and conspiracy to commit aggravated robbery against J.S. and D.S. in juvenile court, in recognition of their cooperation with law enforcement. The People later extended plea offers to both J.S. and D.S., and both of them pleaded guilty to the aggravated robbery count and were sentenced to two years in the Division of Youth Services. 
 ¶14 For their part, Gallegos and Mitchell, the two Black participants, sought to have their cases likewise refiled in juvenile court, but the People refused, and these defendants' cases remained in district court, where they both faced possible prison terms of life with the possibility of parole after forty years. 
 ¶15 Mitchell then filed a motion to dismiss for selective prosecution, arguing that the disparate treatment between him, on the one hand, and the non-Black codefendants, J.S. and D.S., on the other, rose "to the level of a selective 
 
8

 prosecution based on race." In support of this argument, Mitchell acknowledged that to succeed on his selective prosecution claim, he was required to prove that "(1) the prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose." He asserted that the prosecution's charging decisions had a discriminatory effect because the four juveniles were similarly situated, given that all four were equally culpable under a felony murder theory, but the People charged only the two Black defendants with that murder while transferring the non-Black codefendants' cases to juvenile court and then offering them plea deals not offered to the two Black defendants. He further argued that he had established the requisite discriminatory purpose by showing that his disparate treatment was consistent with national, state, and local trends showing that, "[s]tatistically, Black people are treated differently at all levels of the criminal justice system." 
 ¶16 The People responded that Mitchell had not shown either a discriminatory effect or discriminatory purpose. Specifically, the People argued that Mitchell had not shown that he was similarly situated to his non-Black codefendants for purposes of establishing a discriminatory effect because there was "massive factual distinction" between Mitchell's culpability and that of those codefendants. In particular, the People argued that Mitchell alone (1) "chose to continue the action of the robbery, once the victim stepped away from the . . . vehicle"; (2) "chose to 
 
9

 arm himself with a handgun, step outside of the vehicle, and physically confront[] the victim"; (3) "fired the shot which killed the victim in this case, during the physical confrontation which he . . . started, to further the robbery"; and (4) "disposed of the handgun which he used to kill the victim in this case." 
 ¶17 As to discriminatory purpose, the People asserted that the withholding of a plea deal from Mitchell was not evidence of unequal treatment because the fact that some codefendants and not others are offered plea bargains happens routinely and does not, alone, satisfy a defendant's burden to succeed on a claim for dismissal. Regardless, here, in addition to the factual differences in the conduct committed by each of the codefendants, J.S. and D.S. "offered full proffers in cooperation with law enforcement in advance of any plea bargain being offered," thereby justifying differential treatment in plea negotiations. 
 ¶18 The trial court subsequently denied Mitchell's motion. In so ruling, the court reasoned that the evidence presented supported a finding that, regardless of the charges filed, Mitchell's role in the murder was significantly greater than that of J.S. and D.S. Specifically, the trial court noted that the evidence showed that Mitchell was the one who had actually shot and killed the victim. In the court's view, consideration of that fact alone sufficed to allow it to find that Mitchell was not similarly situated to the individuals who drove to the scene but did not otherwise participate in the robbery and murder. In addition, the court opined 
 
10

 that J.S. and D.S. had "each participated in proffers with the district attorney which included acknowledgment of their respective roles in the crime." In light of the foregoing, the court found that Mitchell was not similarly situated with his non-Black codefendants so as to show any discriminatory effect. Finally, the court concluded that the statistics on which Mitchell had relied did not establish discriminatory purpose on the part of the People. 
 ¶19 The case proceeded to trial, and a jury convicted Mitchell of felony murder, aggravated robbery, and conspiracy to commit aggravated robbery. The trial court subsequently sentenced him to a controlling term of life in prison with the possibility of parole after forty years. 
 ¶20 Mitchell appealed, arguing, as pertinent here, that the trial court had erred in denying his motion to dismiss based on selective prosecution due to his race. In his view, he had demonstrated both discriminatory effect (because all four codefendants had allegedly committed the same felony murder but the People had made plea offers only to the non-Black codefendants) and discriminatory purpose (based on statistical evidence purporting to show that Black juveniles are more likely to be prosecuted as adults in Arapahoe County). The division, however, affirmed, agreeing with the trial court that Mitchell was not similarly situated to J.S. and D.S. (for the reasons that the trial court had stated). People v. Mitchell, 2024 COA 7M, ¶¶ 25-28, 52, 547 P.3d 412, 418-19, 423. In light of this determination, 
 
11

 the division did not reach the question of whether Mitchell's statistical evidence met the threshold for establishing the prosecution's discriminatory purpose. Id. at ¶ 29, 547 P.3d at 419. 
 ¶21 Mitchell petitioned this court for certiorari review, and we granted his petition. 
 II. Analysis 
 ¶22 We begin by setting forth the applicable standard of review. We next discuss the law governing claims of selective prosecution. We then apply these legal principles to determine whether the division below erred in upholding the trial court's finding that Mitchell had not established a viable claim of selective prosecution. 
 A. Standard of Review 
 ¶23 "A district court's denial of a motion to dismiss on the ground of selective prosecution involves both conclusions of law and findings of fact." United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000). We review a trial court's factual findings for clear error and its legal conclusions de novo. Martinez v. People, 2024 CO 6M, ¶ 24, 542 P.3d 675, 681. 
 B. Selective Prosecution Claims 
 ¶24 Prosecutors are afforded broad discretion in determining whom to prosecute and the charges to be brought. People v. MacFarland, 540 P.2d 1073, 1075 (Colo. 1975). 
 
12

 This discretion is, however, subject to constitutional limitations. United States v. Armstrong, 517 U.S. 456, 464 (1996). As pertinent here, under equal protection principles, the decision whether to prosecute may not be based on illegitimate standards such as race, religion, or other arbitrary classifications. Id.; see also MacFarland, 540 P.2d at 1075 (noting that "[e]qual protection is not denied absent a showing that a prosecutor has exercised a policy of selectivity [in the enforcement of laws] based upon an unjustifiable standard such as race, religion or any other arbitrary classification"). 
 ¶25 A selective prosecution claim asserts that a prosecutor has brought a charge against a defendant for a constitutionally forbidden reason. Armstrong, 517 U.S. at 463. To establish that a prosecutor has engaged in inappropriate selective prosecution, a defendant must present clear evidence showing that the applicable prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose. Id. at 465. 
 ¶26 To establish a discriminatory effect, a defendant must generally produce some evidence that similarly situated individuals of other races could have been prosecuted but were not. Id. at 469. In this regard, the Supreme Court has recognized a number of legitimate factors that might motivate a prosecutor to bring particular charges against particular defendants. Id. at 465. These include "the strength of the case, the prosecution's general deterrence value, the 
 
13

 Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." Id. (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)). 
 ¶27 Applying these factors, courts have observed that differences in behaviors and the strength of the evidence may inform whether two defendants are dissimilarly situated so as to justify different prosecutorial treatment. See, e.g., Smith, 231 F.3d at 810 (defining a "similarly situated" person for selective prosecution purposes as "one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant-so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan-and against whom the evidence was as strong or stronger than that against the defendant"); Keene v. Mitchell, 525 F.3d 461, 463-65 (6th Cir. 2008) (concluding that a capital murder defendant was not similarly situated to others of a different race involved in an allegedly factually similar murder because the evidence against the defendant was stronger than the evidence against one of the others, the defendant murdered more people than the others, and several of the others had cooperated with the prosecution). 
 
14

 ¶28 To show that the prosecution was motivated by a discriminatory purpose, a defendant must show "more than intent as volition or intent as awareness of consequences." McCleskey v. Kemp, 481 U.S. 279, 298 (1987) (quoting Pers. Adm'r v. Feeney, 442 U.S. 256, 279 (1979)). The defendant must show that the prosecution "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. (quoting Feeney, 442 U.S. at 279). Such evidence of discriminatory purpose may be either direct or circumstantial. United States v. DeBerry, 430 F.3d 1294, 1299 (10th Cir. 2005). 
 C. Application 
 ¶29 Having set forth these principles, we turn to the facts before us. 
 ¶30 Mitchell first contends that the division below erred in concluding that he had not shown a discriminatory effect. We are not persuaded. 
 ¶31 As noted above, to establish a discriminatory effect in a case like this, a defendant must generally produce some evidence that similarly situated individuals of other races could have been prosecuted but were not. Armstrong, 517 U.S. at 469. To assess the prosecution's conduct in a given case, courts may consider, among other factors, the strength of the case and the prosecution's enforcement priorities and enforcement plan. Id. at 465. 
 
15

 ¶32 Here, for several reasons, we conclude that Mitchell has not made the requisite showing. 
 ¶33 First and foremost, as the trial court found, Mitchell's role in the victim's murder was significantly greater than that of the non-Black codefendants. As noted above, Mitchell escalated the situation by confronting the victim with a loaded gun when the victim was walking away from the vehicle, and when the victim attempted to defend himself, Mitchell shot him in the chest. In contrast, neither D.S. nor J.S. did anything to escalate the robbery attempt in a way that resulted in the victim's death. For this reason alone, Mitchell was not similarly situated to them. See Smith, 231 F.3d at 810 (defining a "similarly situated" person for selective prosecution purposes as one who "committed the same basic crime in substantially the same manner as the defendant"); see also Keene, 525 F.3d at 462, 465 (concluding that a Black defendant was not similarly situated to his White codefendant because, unlike the defendant, the codefendant was not the "triggerman" in the course of any of the murders at issue). 
 ¶34 Second, the evidence against Mitchell was strong. As noted above, J.S. and D.S. both implicated Mitchell as the sole triggerman. In addition, Mitchell's Snapchat messages to his girlfriend the night of the shooting acknowledged that he had done "some stuff" and that the incident had not "go[ne] as planned," and 
 
16

 he attached a news article about the shooting. The evidence also showed that Mitchell was the one who ultimately disposed of the gun. 
 ¶35 Third, the People's decision to prioritize obtaining a murder conviction from the person who was directly responsible (and most culpable) for the victim's death was an appropriate enforcement strategy. 
 ¶36 Finally, given J.S.'s and D.S.'s more limited roles in the victim's murder and their willingness to admit their roles and to cooperate in the present prosecution, the People's decision to offer them plea deals and to rely on their testimony in bringing the victim's killer to justice was likewise an appropriate prosecutorial strategy. 
 ¶37 We are not persuaded otherwise by Mitchell's contention that he was similarly situated to his non-Black codefendants merely because they were all charged with felony murder at the inception of the case. "Determining whether a [defendant] is similarly situated to those not prosecuted [is] a fact-intensive and case-specific comparative inquiry," not a charge-specific one. Frederick Douglass Found., Inc. v. District of Columbia, 82 F.4th 1122, 1138 (D.C. Cir. 2023). A defendant who shares a criminal charge with others cannot by virtue of the shared charge alone be said to be similarly situated with those others. In re United States, 397 F.3d 274, 285 (5th Cir. 2005); see also United States v. Wilson, 123 F.4th 1021, 1028 (9th Cir. 2024) 
 
17

 ("To be similarly situated means more than merely committing the same crime in the same place."). 
 ¶38 We likewise are unpersuaded by Mitchell's assertion that the statistical evidence that he produced showing unequal treatment of Black adults and juveniles in United States and Colorado courts generally and in the Eighteenth Judicial District in particular established a discriminatory effect. Standalone statistical evidence, without a showing that those involved were similarly situated, seldom suffices to prove discriminatory effect. See Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir. 2001) ("[P]arties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated."); cf. United States v. Mesa-Roche, 288 F.Supp.2d 1172, 1187-88 (D. Kan. 2003) (noting the importance of statistical evidence in traffic stop cases because of the virtual impossibility of identifying similarly situated individuals who were not stopped). 
 ¶39 Here, Mitchell did not show how the statistics that he cited established that Black defendants were treated differently from similarly situated non-Black defendants. 
 ¶40 In this regard, Armstrong, 517 U.S. at 458-59, 470, is instructive. In Armstrong, the defendants were indicted in federal court for selling crack, and they 
 
18

 filed a motion for discovery or dismissal, alleging that they were selected for federal prosecution because they were Black. Id. at 458-59. In support of this motion, the defendants offered only an affidavit from a "Paralegal Specialist" with the Federal Public Defender's Office, asserting that in every one of the twenty-four cases in which clients of that office were charged under the same statute as the defendants, the client was Black. Id. at 459. Attached to this affidavit was a "study" listing the twenty-four defendants, their race, whether they were prosecuted for selling cocaine as well as crack, and each case's status. Id. The Court ultimately concluded that the study did not constitute some evidence to support a selective prosecution claim because it did not "identify individuals who were not Black and could have been prosecuted for the offenses for which [the defendants] were charged, but were not so prosecuted." Id. at 470 (emphasis added). 
 ¶41 In the matter before us, as was the case with the statistical evidence presented in Armstrong, Mitchell's statistical evidence did not demonstrate that any similarly situated non-Black person escaped prosecution for felony murder. Although Mitchell's statistical evidence focused on the disparate treatment experienced by Black adults and juveniles generally in courts throughout the United States, in Colorado, and in the Eighteenth Judicial District, the evidence did not include the facts underlying the cases involving non-Black defendants. 
 
19

 Nor did the evidence indicate the crimes charged in such cases or the result of those prosecutions. Without such information, we cannot determine whether these persons were similarly situated to Mitchell such that their disparate prosecutorial treatment was unjustified. 
 ¶42 For these reasons, we conclude that the division correctly determined that Mitchell was not similarly situated to J.S. and D.S. and that Mitchell therefore did not show the discriminatory effect necessary to support his selective prosecution claim. 
 ¶43 Even if Mitchell could argue that he produced some evidence of discriminatory effect, however, we would still conclude that he did not establish a right to dismissal based on selective prosecution because he did not show the requisite discriminatory purpose. 
 ¶44 Mitchell contends that he established such a purpose in three ways. First, he provided statistical evidence demonstrating the disproportionate rate at which Black juveniles are arrested, prosecuted as adults, and imprisoned in Colorado. Second, he relies on the People's decisions (1) to withhold a plea deal from him; (2) to question him at his reverse transfer hearing about his prior contacts with law enforcement; and (3) to emphasize at the reverse transfer hearing his individual culpability in the shooting but then to change course at trial and argue that it did not matter to the jury's decision that "nobody meant for anybody to die." Third, 
 
20

 Mitchell contends that the People were aware "that a conviction was more likely to enter against a Black juvenile over a non-Black juvenile in the 18th judicial district and that such a conviction would result in a prison sentence in adult court." In Mitchell's view, this knowledge motivated the People to treat him differently from his non-Black codefendants. Again, we are unpersuaded. 
 ¶45 As noted above, to establish the People's discriminatory purpose, Mitchell was required to introduce direct or circumstantial evidence that the People engaged in a particular course of conduct at least in part because of, not merely in spite of, its effect on Mitchell due to his race. See McCleskey, 481 U.S. at 298; DeBerry, 430 F.3d at 1299. He did not satisfy this burden here. 
 ¶46 With respect to Mitchell's proffered statistical evidence, for the same reasons that this evidence did not establish a discriminatory effect, it did not establish a discriminatory purpose. Moreover, Mitchell did not tie his general statistical evidence to the People's conduct in this case. 
 ¶47 With respect to the People's decision to offer plea deals to the non-Black codefendants and to withhold a similar offer from Mitchell, as noted above, Mitchell's role in the victim's murder was significantly greater than that of the non-Black defendants (he was the one who escalated the attempted robbery and then shot and killed the victim), and this alone warranted treating these participants differently. 
 
21

 ¶48 With respect to the People's decision to question Mitchell at the reverse transfer hearing regarding his criminal history and his culpability for the murder at issue, as Mitchell acknowledges, inquiry into a juvenile's record, criminal history, and whether the juvenile used, or possessed and threatened to use, a deadly weapon in the commission of a delinquent act are factors that a court must consider in a reverse transfer hearing (a proceeding in which a juvenile whose case has been direct filed in district court petitions to have the case transferred to juvenile court). § 19-2.5-801(4)(b), C.R.S. (2025). Nor do we view the People's different approaches at the reverse transfer hearing and at trial as indicative of the People's discriminatory purpose. Instead, the People's approaches reflected the different issues before the court at the respective proceedings. As noted above, the reverse transfer hearing required the court to consider certain factors. See id. At trial, the prosecution's approach was guided by the elements of the offenses that it was trying to prove. And Mitchell himself acknowledges that for purposes of proving felony murder, it was immaterial whether any of the participants wanted the victim to die. See § 18-3-102(1)(b), C.R.S. (2019) (setting forth the elements of felony murder at the time the crime at issue was committed); see also § 18-3-103(1)(b), C.R.S. (2025) (setting forth the current elements of felony murder). 
 ¶49 Finally, as to Mitchell's contention that the People knew that a conviction was more likely to enter against a Black juvenile over a non-Black juvenile in the 
 
22

 Eighteenth Judicial District and that such a conviction would result in a prison sentence if tried in the district court, Mitchell produced no evidence to support this assertion. Nor did he produce evidence to show that any such knowledge on the part of the People somehow influenced their prosecutorial decisions in this case, and we view such a logical leap as mere speculation. 
 ¶50 Accordingly, we conclude that even had Mitchell presented sufficient evidence of a discriminatory effect, he did not satisfy his burden of showing the requisite discriminatory purpose. 
 III. Conclusion 
 ¶51 For these reasons, we conclude that Mitchell did not satisfy his burden of showing that the People's conduct in this case had a discriminatory effect and was motivated by a discriminatory purpose. Accordingly, we perceive no error in the division's decision to uphold the trial court's order denying Mitchell's motion to dismiss based on the People's alleged selective prosecution. 
 ¶52 We therefore affirm the division's judgment.